## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **CHARLES T. MEHLMAN** | : | **Case No.** |
| **407 Lafayette Ave.** | : | **Judge_____** |
| **Cincinnati, OH 45220,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **COMPLAINT FOR DAMAGES** |
| | : | **JURY DEMAND** |
| **v.** | : | |
| | : | |
| **Cincinnati Children's Hospital Medical** | : | |
| **Center** | : | |
| **3333 Burnet Ave.** | : | |
| **Cincinnati, OH 45229** | : | |
| | : | |
| **Also serve Agent** | : | |
| **J. David  Brittingham** | : | |
| **Dinsmore & Shohl, LLP** | : | |
| **255 E. Fifth Street - #1900** | : | |
| **Cincinnati, OH 45202** | : | |
| | : | |
| **Richard M.  Rudy, MD** | : | |
| **Cincinnati Children's Hospital Medical** | : | |
| **Center** | : | |
| **3333 Burnet Avenue** | : | |
| **Cincinnati, OH 45229** | : | |
| | : | |
| **And** | : | |
| | : | |
| **Daniel von Allmen, MD** | : | |
| **Cincinnati Children's Hospital Medical** | : | |
| **Center** | : | |
| **3333 Burnet Avenue** | : | |
| **Cincinnati, OH  45229** | : | |
| | : | |
| | : | |
| **Defendants.** | : | |

1

**Comes now Plainti**ff Doctor Charles T. Mehlman ("Plaintiff" or "Dr. Mehlman"), by and through counsel, and for his complaint against Defendants Cincinnati Children's Hospital Medical Center ("CCHMC"), Richard M. Ruddy, MD ("Dr. Rudy") and Daniel von Allmen, MD ("Dr. von Allmen") (CCHMC, Dr. Ruddy and Dr. von Allmen each also being a "Defendant" will be collectively referred to as "Defendants") alleges as follows:

## I.    <u>NATURE OF THE ACTION</u>

This is an action that seeks redress for the insidious pattern of retaliatory actions to which Defendants have subjected Dr. Mehlman since he started voicing concerns as early as 2006 about the dangerous and fraudulent practices of the now infamous Doctor Abubakar Atiq Durrani ("Durrani").[1] Those practices however were making a lot of money for CCHMC. As reported in an October 2019 Cincinnati Magazine article, "Durrani's total billing at CCHMC more than doubled from $1.5 million in 2005 to $3.6 million in 2008 according to hospital data. He was known by administrators to be the top producer in the hospital's entire surgery department." Cincinnati Magazine, Oct. 2019. A true and accurate copy of the article is attached hereto as <u>Exhibit A</u>. To wit, in a sworn testimony, Surgeon-In-Chief Richard Azizkhan, MD testified that Durrani was the number one money making surgeon at CCHMC.

Thus, while speaking internally, Dr. Mehlman was merely asked to "be quiet." Defendants did not want to jeopardize the cash machine that Durrani had become for them. However, Defendants' tone and actions changed when Dr. Mehlman agreed to be interviewed by federal investigators in late 2012 and then deposed in various lawsuits filed against Durrani and CCHMC. From then on, Defendants have seized on every opportunity to fabricate a pretext to take unjustified disciplinary

---

[1] Abubakar Atiq Durrani was employed by CCHMC from around 2005 to 2008 at which time he was allowed to resign after numerous complaints were registered against him. However, Defendant permitted Durrani to treat Defendant's patients in his private practice.

action against Dr. Mehlman. Defendants were willing to sacrifice patients' lives and limbs at the altar of money. Now, after unsuccessfully trying to prevent Dr. Mehlman to speak out about Durrani's rogue practices and surgeries, Defendants are on a mission to punish him. Defendants' latest action is the legendary straw that broke the camel's back and forced Dr. Mehlman to file this lawsuit.

## II.   PARTIES

1.   Plaintiff Charles Mehlman is a citizen and resident of the state of Ohio.

2.   Defendant Cincinnati Children's Hospital Medical Center ("CCHMC) is located in Hamilton, County, Cincinnati, Ohio and is an employer within the meaning of Ohio state law.

3.   Defendant Richard M. Ruddy, MD is the president of the Executive Committee Medical Staff at CCHCM. He resides at 3740 Middleton Avenue, Cincinnati, OH 45220.

4.   Defendant Daniel von Allmen, MD, is Surgeon-In-Chief and a member of the Medical Executive Committee at CCHMC. He resides at 1093 Tuscany Place, Cincinnati, OH 45226.

## III.   JURISDICTION AND VENUE

5.   The Court has subject-matter jurisdiction in this action pursuant to 28 U.S.C. §§1331 and 2601 et. seq., and 29 U.S.C. §794(a) because the Complaint states a claim that arises under the laws of the United States. This Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 USC §1367 because these claims are so related to the federal claims in this case that they form part of the same case or controversy.

6.   Venue is proper in the Southern District of Ohio under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. Defendants transact business in this District and did so at all times relevant to this Complaint and all the actions giving rise to this action occurred in this District.

## IV.   FACTUAL ALLEGATIONS

### 1. Dr. Mehlman

7.   Plaintiff, Dr. Mehlman, is a pediatric orthopedic surgeon, board certified in orthopedic surgery, and has been licensed to practice medicine in the State of Ohio since 1990.

8.   Dr. Mehlman began his employment with CCHMC in 1996 as an attending pediatric orthopedic surgeon in the CCHMC's Division of Pediatric Orthopedic Surgery where he remains today.

9.   On March 1, 2002, Dr. Mehlman entered into an employment contract with CCHMC (the "Contract"). A true and accurate copy of the Contract is attached hereto as Exhibit B.

10. The Contract provides in part that Dr. Mehlman shall be a full-time employee; shall comply with all policies, procedures, rules and regulation of [CCHMC]; and shall comply with all legal and ethical standards relating to the practice of medicine (Section (d)(iii). See Sections 5(a); 5(c) and 5 (d)(iii) successively.

11. Section 8 provides for Dr. Mehlman to be able to exercise at all time his free and independent judgment as it related to the care of his patients.

12. Finally Section 18(j) sets forth the terms of a dispute resolution process in the event of "any dispute arising out of or relating to this Agreement […] In particular it requires the complaining party to give notice of a disagreement and allow the other party 15 days to respond.

13. Dr. Mehlman is also a Professor of Pediatrics and Pediatric Orthopedic Surgery at the University of Cincinnati, Director of Musculoskeletal Outcome Research, Director of Pediatric Orthopedic Resident Education, Division of Pediatric Orthopedic Surgery at CCHMC.

14. Since 2010, he has been a participant and later the leader of the Orthopedic Working Group of US News and World Report tasked with creating the standards used to rank all of the Children's

Hospitals in the United States. Dr. Mehlman is also a widely published researcher. For a complete description of Dr. Mehlman's qualifications, a copy of his curriculum vitae is attached hereto as Exhibit C.

### 2.  Durrani's Tenure at CCHMC

15. Durrani completed a Pediatric Orthopedic Surgery fellowship at CCHMC July 1997 through June 1998.

16. Durrani was accepted in 1999 for a residency in orthopedic surgery training at the University of Cincinnati, completing it in 2003 with an average rating. Public court filings indicate that at least five plaintiffs filed lawsuits in the Hamilton County, Ohio Court of Common Pleas, naming Durrani as a defendant during the course of his residency.[2]

17. On or around January 2005, Durrani was offered and accepted employment at CCHMC in the Department of Pediatric Orthopedic Surgery as an attending surgeon. Less than three (3) years later, he would later tender a resignation letter on August 7, 2008 stating that as of December 31, 2008, he was leaving CCHMC. Despite having tendered his resignation, he continued to perform more than 200 additional surgeries at CCHMC between August and December that year and shockingly another 28 surgeries at CCHMC between January 2009 and March 7, 2009.

18. Some of the most egregious and preventable harm unleashed by Durrani came in this post-resignation letter timeframe, including but not limited to, performing a surgery that would result in the permanent paralysis of adolescent idiopathic scoliosis patient Jade Hamby on August 22,

---

[2] Tracey Newton, Case No. A 0006529, filed on October 16, 2000; Casey Pflum, Case No. A 0202959 filed on April 12, 2002; James Johnston, Case No. A 0206303, filed on August 16, 2002; Robert Ferrell, Case No. A 0301625, filed on February 28, 2003, and Robert Hughes, Case No. A 0302815, filed on April 11, 2003. Courts may take judicial notice of public records, *Armengau v. Cline*, 7 F. App'x 336, 344 (6th Cir. 2001).

2008. Paralyzed and in a wheelchair, Jade would later live her life in a nursing home facility and die on May 9, 2018. Jade's story has been told by local Cincinnati news media.

19. During the nine years where Durrani was working at CCHMC, Dr. Mehlman had the opportunity to observe Durrani's behavior and practice pattern. During the time period of 2005 through 2008 at CCHMC Durrani's ability to perform so many surgeries was directly supported by a number of CCHMC administrators including but not limited to Frederick C Ryckman, MD (surgeon director of the operating rooms at CCHMC), Kathie Hays, RN (nursing director of the operating rooms at CCHMC), Peter Clayton (business director of surgical services), Sandy Singleton (business director pediatric orthopedic surgery), and Eric J Wall, MD (Division Director Pediatric Orthopedic Surgery).

20. Despite all the aforementioned, Defendants did not suspend Durrani's privileges at any time.

21. Durrani's total billing at CCHMC more than doubled from $1.5 million in 2005 to $3.6 million in 2008 according to hospital data. He was known by administrators to be the top producer in the hospital's entire surgery department."

### 3. <u>Richard M Ruddy, MD</u>

22. Beginning in 2015 and continuing to the present day, Dr. Richard Ruddy has been instrumental in the insidious pattern of retaliation against Dr. Mehlman. Dr. Ruddy has accomplished this through a variety of different CCHMC administrative positions that he has held over that same period of time. Those positions have brought him favor from the highest levels at CCHMC as they culminated in him becoming Medical Staff President.

23. In Dr. Ruddy's capacity as committee chairman of PPEC, he initiated or participated in a number of PPEC actions against Dr. Mehlman. These included but are not limited to at least nine

instances, January 15, 2015, March 24, 2016, July 13, 2016, October 7, 2016, November 30, 2017, January 11, 2018, February 9, 2018, February 23, 2018, and March 23, 2018.

24. As the pattern of retaliation became clear, on March 28, 2018, Dr. Mehlman's former counsel sent a formal letter to William Ford, III, Senior counsel at CCHCM notifying CCHMC of the pattern of retaliation against Dr. Mehlman.

25. Dr. Ruddy, in his capacity as Clinical Director of CCHMC Liberty Campus (a satellite hospital of CCHMC's located in Liberty Township, OH), repeatedly expressed displeasure that Dr Mehlman was not eager and committed to leave his established practice at CCHMC's main downtown campus in order to perform surgery and admit patients to the new suburban Liberty Hospital (approximately 20 miles distant from main hospital).

26. Dr. Ruddy, in his capacity as President of the CCHMC Medical Executive Committee, also informed Dr. Mehlman of his suspension on September 16, 2020.

27. Thus, over the course of four years Dr. Ruddy has acted both as an agent of CCHMC and with his own independent personal stake as he administered retaliatory punishments to Dr. Mehlman. Over those years Dr. Ruddy acted in multiple and overlapping roles functioning as a biased judge, jury, and executioner. Dr. Ruddy had personal motives to both please CCHMC administration (his rise through the ranks supports this) and to strike back at Dr Mehlman for not supporting the new CCHMC facility that Ruddy directed.

### 4. Daniel von Allmen, MD

28. Beginning in 2012 and continuing to the present day, Dr. von Allmen has also been an active participant in the insidious pattern of retaliation against Dr. Mehlman. Dr. von Allmen has accomplished this through a variety of different CCHMC administrative positions that he has held

over that same period of time. Those positions that have brought him favor from the highest levels at CCHMC as they culminated in him being named Surgeon-In-Chief.

29. Dr. von Allmen, in his capacity as a member of PPEC, participated in a PPEC action against Dr. Mehlman on October 5, 2012. In this meeting, Dr. Mehlman shared with Dr. von Allmen his ongoing concerns about the Durrani matter and the fact that Dr. Mehlman had been contacted by federal agents regarding the Durrani matter (Special Agent Ryan Houston, U.S. Department of Health and Human Services Office of Inspector General, Office of Investigations). Dr. von Allmen admitted remembering this aspect of the October 5, 2012 meeting during open discussion on September 16, 2020 with Richard Ruddy, MD, James J McCarthy, MD (Division Director Pediatric Orthopedic Surgery), and Dr. Mehlman present.

30. Dr. von Allmen, in his capacity as Surgeon-In-Chief and as a member of PPEC, was involved in an October 7, 2016 PPEC action against Dr. Mehlman. In this meeting Dr. Mehlman once again made points regarding erratic support in the Operating Room and questioned "a system that routinely puts strangers in position to fail." This meeting resulted in the threat of suspension if "similar conduct occurs in the future."

31. As noted above, the pattern of retaliation became clear, on March 28, 2018, Dr. Mehlman's former counsel sent a formal letter to William Ford, III, Senior counsel at CCHCM notifying CCHMC of the pattern of retaliation against Dr. Mehlman.

32. Dr. von Allmen has been openly critical of the U.S. News & World Report Best Children's Hospitals ranking process, commenting about the "arbitrary questions" related to the U.S. News process.

33. For nearly a decade, Dr. Mehlman has been intimately involved with creating those questions for U.S. News & World Report including questions that have created new data reporting

burdens at CCHMC as well as new surgical team requirements, things that Dr. von Allmen is well aware of.

34. As alluded to in the introductory section (Nature of the Action) of this Complaint, the straw that broke the camel's back came on September 16, 2020 when Dr. von Allmen, acting as Surgeon-In-Chief and as a member of the CCHMC Medical Executive Committee informed Dr. Mehlman of his suspension.

35. Thus, over the course of eight years, Dr. von Allmen has acted both as an agent of CCHMC and with his own independent personal stake as he administered retaliatory punishments to Dr. Mehlman. Over those years, Dr. von Allmen acted in multiple and overlapping roles functioning as a biased judge, jury, and executioner. Dr. Von Allmen had personal motives to both please CCHMC administration (his rise through the ranks also supports this) and to strike back at Dr Mehlman for being a major part of the hospital ranking process that he found so annoying.

36. After all of these meetings (over the course of 8 years) and despite voicing his interests in supporting and helping Dr. Mehlman, and emphasizing the valued contributions that Dr. Mehlman made to the medical center, not one single time did Dr. von Allmen ever visit Dr. Mehlman in the O.R. setting. Thus, no effort was ever made to personally witness any of the alleged behaviors that Dr. Mehlman was being accused of.

### 5. **Dr. Mehlman Reports Care Issues But is Asked to Stay Quiet**

37. Beginning in 2006, Dr. Mehlman grew increasingly concerned about the medical treatment and care provided by Durrani at CCHMC.

38. On or about August 14, 2006, a male patient undergoing kyphosis surgery by Durrani suffered spinal cord compromise in the early post-operative period necessitating revision surgery. On or about November 25, 2006, a second patient, this time female, would suffer the same spinal

cord compromising complication following kyphosis surgery. These complications had never been seen before at CCHMC and Dr. Mehlman brought this to the attention of multiple CCHMC administrators. Court records from May 28, 2008 reveal that the first patient brought suit against Durrani and CCHMC.

39. Steven S Agabegi, MD and Twee T Do, MD also repeatedly registered their concerns orally and in writing about these practices by Durrani (both surgeons were members of the CCHMC's Division of Pediatric Orthopedic Surgery).

40. Dr. Mehlman repeatedly made his concerns about Durrani known to the Division Director for Orthopedics, as well as others in leadership positions at CCHMC.

41. For over a year, Dr. Mehlman raised concerns orally and in writing about Durrani's practices with departmental leadership. Yet, Defendants ignored his concerns and continued to allow Durrani to treat patients, perform surgeries, use experimental surgical procedures on children, and even frequently book two operating rooms simultaneously.

42. Dr. Mehlman brought concerns about physician competency and unnecessary and/or dangerous and/or unapproved experimental procedures to CCHMC peer review meetings in order to ensure that the procedures, some of which resulted in additional surgeries and even spinal cord injury/paralysis be investigated. Defendants did not entertain Dr. Mehlman's demands, nor did they welcome his questions.

43. To the contrary, Dr. Mehlman's demands for accountability led to complaints about him from senior management at CCHMC who were backing Durrani due to his generation of revenue and led eventually to Dr. Mehlman's being suspended.

44. Although Dr. Mehlman brought the issue of unnecessary, risky and/or unapproved procedures to the attention of CCHMC executives and Defendants in particular, they continued to

submit claims to the Federal Government for reimbursement in violation of the fraud and abuse laws.

45. Dr. Mehlman repeatedly brought his concerns over the significant number of patient, physician and nurses complaints regarding deficient quality of care and overall negative customer service to the attention of CCHMC executives, and Defendants in particular, but his concerns were ignored. Instead, as a result of Dr. Mehlman's continued efforts to alert CCHMC executives, and Defendants in particular, that these complaints were serious and had to be addressed, Defendants responded by systematically, retaliating against and, eventually suspending Dr. Mehlman.

46. Yet, again, no action was taken against Durrani.

47. Dr Mehlman repeatedly voiced concerns about the routine low levels of competent support offered to surgeons at CCHMC as they performed various complicated surgical procedures. There is no more dramatic and tragic example of this than the August 21, 2010 high profile intraoperative death of 7-month-old Tressel Meinardi who died because of incompetent support by operating room personnel.

48. Dr Mehlman (along with co-authors that included James J McCarthy, MD and Richard Falcone, MD, MPH) conducted internal research aimed at measuring the variation of CCHMC pediatric orthopedic surgical team composition (seeking to quantify how often high frequency team members supported surgical procedures). There were two studies, V.I.P.E.R. (variation in pediatric emergency resources) looking at 634 pediatric trauma surgeries and V.I.S.O.R. (variation in scoliosis operative resources) looking at 100 idiopathic scoliosis surgeries. Both of these studies found disturbingly low levels of high frequency team members supporting the surgeons' cases: only 66% of the trauma cases had high frequency team members and a shocking 34% of scoliosis cases had high frequency team members.

49. The V.I.P.E.R. and V.I.S.O.R study results were shared with CCHMC senior leadership, including but not limited to August 7, 2013 communication with Frederick C Ryckman, MD (surgeon director of the CCHMC operating rooms) and August 26, 206 communication with Richard Ruddy, MD (at that time Chairman of PPEC).

50. Other specific instances of Dr. Mehlman alerting CCHMC leadership (and the reactions of the leadership) are as follows:

(i)     On or about June 19, 2006 after orally complaining about Durrani's medical practices during a teaching conference, Dr. Eric Wall, who was Pediatric Orthopedic Surgery Division Director, passes a message from the leadership to Dr. Mehlman: "Chuck, you've been asked to be quiet.".

(ii)    At around the same time, Dr. Junichi Tamai, (also Pediatric Orthopedic Surgeon attending the same teaching conference and sitting near Dr Mehlman), states to Dr. Mehlman: "Sometimes asking questions makes you a bad person."

(iii)   On or around November 20, 2007, after Durrani performed a questionable experimental surgery, Dr. Mehlman emails Dr. Eric Wall suggesting a review of the institutional review board ("IRB"), also known as institutional review board ("IRB").

(iv)    In a series of subsequent emails to leadership between December 2007 and February 2008, Dr. Mehlman again warns about the dangers of the experimental surgeries performed by Durrani and the discovery by Dr. Mehlman's of non-IRB approved research by Durrani.

(v)     On March 6, 2008, Dr. Mehlman emails Dr. Wall to recommend that the issue of the non-IRB approved experimental surgery be taken to CCHMC's Chief of Surgery.

(vi)    From April 3, to April 7, 2008, Dr. Mehlman sends a series of emails to IRB Chairman Robert Frenck, MD, culminating in the latter directing Durrani to retract his non-IRB approved research submission.

(vii)   Despite Dr. Mehlman continuing to alert leadership that Durrani's dangerous practices were still going on, on June 27, 2008, Dr. Mehlman was asked by CCHMC personnel to support Durrani's application for permanent residency. Dr. Mehlman refused. Less than six weeks later, on August 7, 2008, Durrani tendered his resignation letter to CCHMC. However, CCHMC allowed Durrani to perform more than 200 additional questionable surgeries after that.

(viii)  Some of these surgeries CCHMC allowed Durrani to perform included patients Kenny Wilson and Joshua Roy.

### 6.  The Lawsuits, The Federal Investigation And The Resulting Retaliation

51. Patients Kenny Wilson and Joshua Roy subsequently filed lawsuits in 2009 and 2011 over Durrani's failed medical procedures. Joshua Roy's case was initially filed on 10/28/2011 in Hamilton County, Ohio, Common Pleas Court, captioned *Jeff Roy v. Durrani* (for Josh Roy) and assigned Case No. A-1108652. It was refiled in the District Court for the Southern District of Ohio on 12/04/2018 and assigned Case No. 1-18-cv-00857.[3]

---

[3] Courts may take judicial notice of public records, *Armengau v. Cline*, 7 F. App'x 336, 344 (6th Cir. 2001).

13

52. Kenneth Wilson' cases was initially filed on 9/21/2010 in the Hamilton County, Ohio Common Pleas Court, captioned *Kenneth Wilson v. Durrani* and assigned Case No A-1008608. It was refiled on January 12, 2012 and assigned Case No. A-12 00264.

53. On October 18, 2011, Dr. Mehlman faced a deposition in the aforementioned Kenny Wilson case.

54. On November 6, 2012, Dr. Mehlman faced a deposition in the aforementioned Joshua Roy case.

55. In October 2012, the CCHMC Professional Practice Evaluation Committee ("PPEC") raised concerns about Dr. Mehlman's behavior, despite no concerns having existed or been raised at any time **during the previous 14 years of his employment**. These issues related to interacting with operating room personnel who were extremely unfamiliar with Dr Mehlman and the surgeries that he was performing.

56. Shortly thereafter, Dr. Mehlman discussed the alleged concerns raised with the PPEC and agreed to undergo counseling with a psychologist for his alleged communication issues.

57. In May 2013, federal agents interviewed Dr. Mehlman about Durrani and his actions at CCHMC.

58. On July 26, 2013, local media reported that Durrani would be criminally charged with one count of health care fraud and one count of making false statements in health care matters.

59. A federal grand jury officially indicted Durrani on August 9, 2013.

60. Less than two weeks later, Dr. Peter Sturm, Director of Crawford Spine Center, and Dr. Frederick Ryckman, Sr. Vice President of Medical Operations at CCHMC, met with Dr. Mehlman and accused him of engaging in "abusive conversations, demeaning comments, and insulting comments" with orthopedic and urology OR staff.

61. Five days later, on August 12, 2013, PPEC members Ellis Arjmand and Daniel von Allmen met with Dr. Mehlman regarding the same alleged staff issues.

62. On December 6, 2013, Durrani fled the United States to go to Pakistan and remains on the "Most Wanted List."

63. Between late 2013 and 2015, former patients of Durrani filed hundreds of medical malpractice suits against Dr. Durrani, over 80 of which also included CCHMC as a party defendant.

64. Numerous requests to depose Dr. Mehlman were sent to CCHMC, through counsel. Yet, Dr. Mehlman was never notified.

65. However, PPEC first issued a reprimand to Dr. Mehlman after CCHMC counsel notified Dr. Mehlman that the Durrani plaintiffs sought to depose him in the Wilson and Roy lawsuits noted above.

66. PPEC has significantly increased the number of reprimands issued to Dr. Mehlman since the onslaught of Durrani lawsuits emerged in 2013-2015.

67. On January 15, 2015, PPEC reprimanded Dr. Mehlman regarding a Patient and Family relations survey.  This related to patients and families who felt that they had waited too long for their appointment and a staff member who felt disrespected when a surgical consent could not be located.

68. On July 13, 2016, Dr. Charles Stevenson and Dr. Russel Hirsch from PPEC met with Dr. Mehlman and discussed certain allegations that had allegedly occurred seven weeks earlier.

69. Dr. Mehlman responded to these allegations on August 26, 2016, yet a full two months later, on October 7, 2016, PPEC submitted a letter to Dr. Mehlman's file regarding the incident on

which he had already been counseled, and threatened to suspend him if he did not meet with the job coach selected for him.

70. During late 2017 and early 2018, as another case involving Durrani and CCHMC as defendants moved through discovery, Dr. Mehlman received additional reprimands from the PPEC.

71. On February 22, 2018, Frederick Johnson of Deters Law Firm filed a motion to compel Dr. Mehlman's deposition for "all Children's cases on the issue of Children's liability."

72. Once Dr. Mehlman's deposition became imminent, Defendants escalated their behavior towards him. These actions occurred concurrently with Dr. Mehlman's meeting with CCHMC counsel and hiring his own counsel for representation at depositions.

73. On March 23, 2018, PPEC placed Dr. Mehlman on a performance improvement plan ("PIP") and threatened to refer its concerns to the Medical Executive Committee ("MEC") if Dr. Mehlman did not "cooperate".

74. Dr. Mehlman had already addressed the two family concerns, which were unrelated to his communication or standard of care, undermining any basis for a PIP. Further, none of the allegations against Dr. Mehlman affected the quality of care for Dr. Mehlman's patients.

75. Defendants' behavior towards and professional harassment of Dr. Mehlman prompted him to send a letter, through counsel, to Defendants, sharing his concerns that Defendants' actions were clearly retaliatory. A true and accurate copy of that letter dated March 28, 2018 is attached hereto as Exhibit D.

76. On June 15, 2018, Dr. Mehlman testified against CCHMC for "all Children's cases on the issue of Children's liability" by deposition under subpoena.

77. Less than two weeks later, Dr. Ruddy, the Executive Committee President, notified Dr. Mehlman that CCHMC was only extending his full, unrestricted clinical privileges for another six months. The standard extension throughout Dr. Mehlman's career has been 2 years.

78. Following his deposition under subpoena, and on or about August 31, 2018 CCHMC integrity and compliance personnel and CCHMC counsel contacted and met with Dr. Mehlman and his personal counsel regarding storage of Durrani-related patient information.

79. On December 18, 2018, Dr. Mehlman testified under subpoena, at trial in the matter of *Melissa Cotter, et al. v. Durrani and CCHMC*, Case No. A1406929.

80. On December 19, 2018, the jury returned a verdict against Dr. Durrani and CCHMC, awarding over two million dollars in damages to Jacob Cotter for negligent credentialing and retention.

81. In the verdict form, the jury stated as follows:

      (i)     In Jury Interrogatories Stage II, Interrogatory (C), the verdict form stated:

     "If you found in Interrogatory (B) that Cincinnati Children's Hospital Medical Center negligently credentialed or retained Dr. Durrani's privileges to practice medicine at Cincinnati Children's Hospital Medical Center, state below in what respects the hospital was negligent."

     The jury answered: "Having knowledge of Dr. Durrani's pattern of inappropriate behavior and incompetence having gone through internal discussion leading to Dr. Durrani's resignation, Children's failed to fully revoke his privileges while knowingly allowing him to continue performing surgeries as an employee."

     All 8 juries signed off.

      (ii)    In Jury Interrogatory No. 2 Punitive Damages Section, the verdict form stated:

     "Please state below in what way(s) Cincinnati Children's Hospital acted with malice. In answering Interrogatory No. 2, only those jurors who answered yes to Interrogatory No. 1 are qualified to participate."

     The jury answered: "We find Cincinnati Children's Hospital allowed Dr. Durrani to continue his activities while knowing of mounting and ongoing serious concerns

revolving around his aggressive indications for surgery and in doing so, put the interest of the institution ahead of patients."

All 8 juries signed off.

(iii)     In Jury Interrogatory No. 4 Punitive Damages Section, the verdict form stated:

"Please explain the factors you considered in reaching the amount of the punitive damages awarded to Plaintiffs and against Defendant, Cincinnati Children's Hospital. In answering Interrogatory No. 4, only those jurors who answered yes to Interrogatory No. 1 are qualified to participate."

The jury answered: "The Defendant's permitted behavior of Dr. Durrani warrants no-trivial punitive damages in an amount relative to the original surgery but sealed so as to incentivize that such behavior is not repeated."

All 8 juries signed off.

(iv)     In Jury Interrogatory No. 5 Punitive Damages Section, the verdict form stated:

"Please explain the factors you considered in concluding that this award of punitive damages against Defendant, Cincinnati Children's Hospital, is fair and reasonable.  In answering Interrogatory No. 5, only those jurors who answered yes to Interrogatory No. 1 are qualified to participate."

The jury answered:  "Having found Cincinnati Children's Hospital malicious in their negligent retention of Dr. Durrani, we have decided upon an amount of punitive damages for actions in this case which if multiplied by the probable number of similarly unnecessary cases would be proportional for the overall consequences of the negligence."

All 8 juries signed off.

82. On December 20, 2018, Dr. Mehlman met with PPEC, during which meting he was instructed to continue his job coaching sessions.  PPEC also raised new concerns about how Dr. Mehlman handled a surgical consult for a five-year-old pediatric poly-trauma motor vehicle accident victim in early November.

83. Dr. Mehlman recommended a different spine treatment plan for the patient than the treatment recommended by Pediatric Neurosurgery. As per his training, and pursuant to the terms of Section 8 of his employment Agreement providing for Dr. Mehlman to be able to exercise at all time his free and independent judgment as it relates to the care of his patients, Dr. Mehlman noted his treatment recommendation in the patient's chart. PPEC accused Dr. Mehlman of being argumentative and questioned his behavior in recommending a non-surgical treatment option for the patient.

84. In early September 2020, Dr. Mehlman raised concerns about patient safety in a manner reflecting his frustration. He later acknowledged that he could have used more polite language. In response, Defendants disciplined Dr. Mehlman by requiring periodic counseling. Dr. Mehlman complied and intends to comply.

85. On September 18, 2020, despite the discipline already imposed, Defendants again retaliated against Dr. Mehlman by suspending him for two weeks, beginning September 21, 2020.

86. That same day, Dr. Mehlman invoked his contractual right to dispute resolution regarding the suspension. In response, CCHMC breached his employment contract by failing to postpone the suspension. This action caused irreparable harm to Dr. Mehlman and forced the rescheduling of patients who were due for surgery, potentially jeopardizing the health and safety of those patients.

87. Defendants have subjected Dr. Mehlman to retaliatory disciplinary action, including but not limited to, the PPEC allegations, complaints, counseling, the PIP described above, and the suspension on September 18, 2020, as well as retaliatory delay in the renewal of CCHMC's staff privileges at CCHMC. Each retaliatory action coincides with Dr. Mehlman exercising his right and duty to testify and/or report safety violations.

88. The 14-day suspension imposed by Defendants on Dr. Mehlman has been reported to the State of Ohio Medical Board and will need to be disclosed in future applications for hospital privileges and/or membership.

89. As a result of the 14-day suspension, Dr. Mehlman has been unable to perform surgeries and cannot accept referrals to him from other physicians of patients who require the specialty services Dr. Mehlman is qualified to perform.

90. Defendants 'retaliatory actions have damaged Dr. Mehlman professionally, financially and emotionally.

## COUNT I
## Violation of the Retaliatory Provisions of
## The False Claims Act 31 U.S.C. §3730(h)

91. Dr. Mehlman incorporates and restates the allegations of the previous paragraphs of this Complaint as if fully set forth herein.

92. The retaliation provision of the False Claims Act ("FCA") protects an employee, associated other, and/ or contractor from being "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop one or more violations of this subchapter." 31 U.S.C. §3730(h)(1).

93. On numerous occasions, Dr. Mehlman engaged in lawful acts, as set forth in more detail above, in efforts to stop one or more violations of the FCA, including but not limited to, 31 U.S.C. §3729(a)(1)(B), 3729(a)(1)(G), 3729(a)(1)(A) and 3729(a)(1)(C), by CCHMC.

94. Defendants retaliated against Dr. Mehlman because of his protected activity by subjecting him to increased scrutiny, changed terms and conditions of employment, made false

accusations of disruptive and even hostile behavior while Dr. Mehlman was merely exercising his right and duty to report unsafe medical conditions, and dangerous and unapproved surgeries.

95.    As a result of Dr. Mehlman's protected activity, he was threatened, harassed, intimidated, investigated, and his privileges were ultimately suspended.

96.    Defendants retaliated against Dr. Mehlman by suspending his privileges because Dr. Mehlman had engaged in activity protected under the federal FCA.

97.    Such conduct was in violation of the federal FCA protection provision, 31 USC §3730(h).

98.    As a direct and proximate cause of Defendants' conduct of improperly retaliating, harassing, intimidating, threatening, investigating, and suspending Dr. Mehlman's privileges, he has suffered damages including but not limited to loss of income, loss of career opportunities, and emotional distress, including but not limited to embarrassment, humiliation and outrage.

99.    Relief for violating the federal False Claims Act includes all relief necessary to make the employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, or agent on behalf of the employee, contractor, or agent or associated others in furtherance of other efforts to stop one or more violations of the FCA.  Relief also includes reasonable attorneys' fees. *Id.* §3730(h)(1) (a) & (b).

### COUNT II
### Wrongful Disciplinary Action for Providing Truthful Testimony in Violation of Ohio Public Policy

100.    Dr. Mehlman incorporates and restates the allegations of the previous paragraphs of this Complaint as if fully set forth herein

101.    Ohio has a clear public policy in favor of its citizens giving truthful testimony in judicial and quasi-judicial proceedings and seeks to deter both perjury as well as false statements by any individual in official proceedings, or with an intent to incriminate another, which is made manifest by the State's criminal statutes, including but not limited to, Ohio Rev. Code ("O.R.C.") §§ 2921.11 and 2921.13.

102.    These statutes also evince a clear public policy to deter individuals from making false statements under oath, with the purpose of misleading a public official, or made with purpose to secure the issuance by a governmental agency of any license, permit, authorization, certificate, registration, release, or provider agreement.

103.    Ohio's clear public policy which favors and encourages truthful testimony also seeks to deter false, fraudulent, deceptive, or misleading statements in the context of a doctor's medical practice under Ohio's medical licensing procedures.

104.    This clear public policy against an individual making false, fraudulent, deceptive, or misleading statements is further made manifest in the state's statutes governing disciplinary procedures for physicians, including, but not limited to O.R.C. § 4731.22, which empowers the State to punish physicians for making false, fraudulent, deceptive, or misleading statements in the course of the physician's practice by limiting, revoking, or suspending a license or certificate to practice or certificate to recommend, or refusing to renew a license or certificate, refusing to reinstate a license or certificate, or reprimanding or placing on probation the holder of a license or certificate.

105.    Dr. Mehlman acted in accordance with his duty to give truthful and full testimony in the lawsuits against Durrani in which he was called to testify.

106. Dr. Mehlman also acted in accordance with his duty to give full and truthful statements during the course of his interview with federal agents in May 2013.

107. Ohio public policy as manifest in the common law also recognizes the right and duty of an employee to testify truthfully, albeit unfavorably, to his employer.

108. Defendants' retaliation against Dr. Mehlman for providing his truthful sworn testimony and truthful statements to federal agents violates the clear public policy of Ohio.

109. As a direct and proximate cause of Defendants' unlawful conduct, Dr. Mehlman has been injured and is entitled to damages.

## COUNT III
## Wrongful Disciplinary Action For Reporting Suspected Risks to Patient Health And Safety In Violation Of Ohio Public Policy

110. Dr. Mehlman incorporates and restates the allegations of the previous paragraphs of this Complaint as if fully set forth herein

111. Ohio has a clear public policy that favors reporting by employees of potential violations of the State's laws, and or workplace situations or occurrences which are likely to cause a hazard to public health or safety, or which may be a felony under Ohio law.

112. This clear public policy is reflected in Ohio's statutes, regulations, and common law, including but not limited to, Ohio's Whistleblower statute, O.R.C. § 4113.52.

113. This clear public policy is further reflected in the state's statutes and corresponding administrative regulations requiring disciplinary action and reporting of same to the state medical board by hospitals and medical associations in cases where a medical association or hospital such as CCHMC has reason to suspend or revoke privileges or take other disciplinary action for violations of professional ethics, or for reasons of medical incompetence or medical malpractice,

23

including but not limited to O.R.C. §§ 4731, 4731.22, 4731.224, Ohio Admin. Code §§ 4731-15, 4731-18, as well as Ohio common law.

114.    Defendants have a duty to refrain from taking retaliatory actions against employees who report potential violations of laws and regulations, including those that are likely to cause a hazard to public health or safety or which may be a criminal offense.

115.    Defendants breached this duty when they retaliated against Dr. Mehlman for reporting complaints about Durrani for what he perceived to be dangerous medical practices to Hospital supervisory staff, and subsequently providing truthful testimony consistent therewith during his interview with federal agents and throughout the course of the proceedings in which he was called to testify as a deponent and or trial witness. Defendants breached the policy again by suspending him on September 18, 2020.

116.    Defendants' retaliation against Dr. Mehlman is a direct violation of public policy.

117.    As a direct and proximate cause of Defendants' unlawful conduct, Dr. Mehlman has been injured and is entitled to damages.

## COUNT IV
## Wrongful Disciplinary Action for Retaining Counsel in Violation of Ohio Public Policy

118.    Dr. Mehlman incorporates and restates the allegations of the previous paragraphs of this Complaint as if fully set forth herein

119.    Defendants' retaliation against Dr. Mehlman for retaining and consulting with legal counsel violates Ohio's clear public policy in favor of open access to the courts as made manifest by various sources, including but not limited to the Ohio Constitution, Ohio common law, and the Ohio Supreme Court's Rules of Professional Conduct adopted by the Ohio Supreme Court.

120.     Section 16, Article 1 of the Ohio Constitution, which provides: "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law."

121.     Defendants' retaliation against Dr. Mehlman for consulting and retaining counsel violates the clear public policy of Ohio which favors the right of an employee to consult with an attorney regarding his legal rights.

122.     Defendants' retaliatory actions against Dr. Mehlman also violate Dr. Mehlman's right and duty to testify truthfully, albeit unfavorably, regarding suspected wrongful conduct by his employer.

123.     As a direct and proximate cause of Defendants' unlawful conduct, Dr. Mehlman has been injured and is entitled to damages.

## COUNT V
## Breach of Contract And Of The Duty of Fair Dealing

124.     Dr. Mehlman incorporates and restates the allegations of the previous paragraphs of this Complaint as if fully set forth herein.

125.     On September 18, 2020, Defendants breached Dr. Mehlman's Employment Agreement by preventing him from exercising his duties pursuant to Section 5 of the Employment Agreement.

126.     On September 18, 2020, Defendants also breached Dr. Mehlman's Employment Agreement by refusing to honor their obligation to mutually attempt to resolve the dispute before imposing the suspension as set forth in Section 18(j) of the Agreement.

127.     In addition, because the refusal to honor its obligation under the Agreement was in retaliation of  Dr. Mehlman's retaining counsel and reporting potential violations of laws and regulations, including those that are likely to cause a hazard to public health or safety or which

may be a criminal offense, Defendants also breached their duty of good faith and fair dealing implied in the Agreement.

128.    As a direct and proximate cause of Defendants' breaches, Dr. Mehlman has suffered damages in an amount to be proven at trial.

<u>COUNT VI</u>
<u>Tortious Interference With Business Relationship</u>

129.    Dr. Mehlman incorporates and restates the allegations of the previous paragraphs of this Complaint as if fully set forth herein.

130.    At all times set forth above, Defendants had knowledge that Dr. Mehlman had a business relationship with many physicians who refer patients to him who required the specialty services Dr. Mehlman was qualified to perform.

131.    At all times set forth above, Defendants had knowledge that Dr. Mehlman had a business relationship with the patients that he saw and treated at CCHMC.

132.    By retaliating against Dr. Mehlman and making false and defamatory statements about him resulting in the suspension of his privileges, Defendants intentionally and improperly interfered with the business relationships and expectancies between Dr. Mehlman and his patients and the referring physicians.

133.    Defendants, through their agents and employees, reached out to the referring physicians in an effort to induce or cause a breach or termination of the relationship or expectancy with the referring physicians, these patients and Dr. Mehlman. Again, Defendants intentionally and improperly interfered with the business relationships and expectancies between Dr. Mehlman and his patients and the referring physicians.

134.    By retaliating against Dr. Mehlman and making false and defamatory statements and intentionally inducing or causing a breach or termination of the relationship or expectancy

26

with the referring physicians, as set forth above, Defendants intended to, and did, interfere with the contracts and business relationships and expectancies, causing their breach, disruption, or termination.

135.     As a direct and proximate result of Defendants actions, Dr. Mehlman has suffered substantial economic injury, loss of goodwill, harm to its business reputation, loss of esteem and standing in the community, and loss of business opportunities.

<u>**COUNT VII**</u>
<u>**Intentional Infliction of Emotional Distress**</u>

136.     Dr. Mehlman incorporates and restates the allegations of the previous paragraphs of this Complaint as if fully set forth herein.

137.     By retaliating against Dr. Mehlman, Defendants knew or should have known that their actions were likely to cause severe emotional distress to Dr. Mehlman.

138.     Defendants 'conduct as outlined above was knowing and intentional and outrageous.

139.     Defendants' conduct as outlined above was for an ulterior motive or purpose.

140.     Defendants' conduct resulted in severe and serious emotional distress.

141.     As a direct and proximate result of Defendants' intentional conduct, Dr. Mehlman has been damaged, including but not limited to suffering from emotional distress humiliation, mortification, embarrassment, sleeplessness and anxiety.

<u>**COUNT VIII**</u>
<u>**Negligent Infliction of Emotional Distress**</u>

142.     Dr. Mehlman incorporates and restates the allegations of the previous paragraphs of this Complaint as if fully set forth herein.

143.     Defendants 'conduct as outlined above was careless.

144.     By retaliating against Dr. Mehlman, Defendants knew or should have known that their actions were likely to cause severe emotional distress to Dr. Mehlman.

144.     Defendants 'conduct as outlined above was for an ulterior motive or purpose.

145.     Defendants' conduct resulted in severe and serious emotional distress.

146.     As a direct and proximate result of Defendants' careless conduct, Dr. Mehlman has been damaged, including but not limited to suffering from emotional distress humiliation, mortification, embarrassment, sleeplessness and anxiety.

## PRAYER FOR RELIEF

**WHEREFORE**, Dr. Mehlman demands judgment against Defendants as follows:

a)     That each of the Defendants be enjoined from further unlawful conduct as described in the Complaint;

b)     That Dr. Mehlman be awarded damages in the form of twice the amount of his back pay, interest on such back pay, compensation for all special damages, attorney fees and all other relief to which he is entitled as a result of Defendants' violations of 31 U.S.C. §3730(h).

c)     That Dr. Mehlman be awarded compensatory damages as a result of Defendants' actions;

d)     That Dr. Mehlman be awarded punitive damages as a result of Defendants' actions;

e)     That Dr. Mehlman be awarded liquidated damages as a result of Defendants' actions;

f)     That Dr. Mehlman be awarded pre-judgment interest as a result of Defendants' actions;

g) That Dr. Mehlman be awarded reasonable attorney's fees and costs from Defendants;

h) That Dr. Mehlman be awarded all other legal and equitable relief to which he may be entitled.

Respectfully submitted,

**STATMAN, HARRIS & EYRICH, LLC**

**/s/ Alan J. Statman**
Alan J. Statman (0012045)
Sylvie Derrien (0072579)
Executive Building
35 E. 7th Street, Suite 315
Cincinnati, Ohio 45202
Phone: (513) 621-2666
Facsimile: (513) 621-4896
E-Mail:  ajstatman@statmanharris.com
              sderrien@statmanharris.com
*Attorneys for Plaintiff, Dr. Charles T. Mehlman*

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

/s/ Alan J. Statman