

# JUSTICE DELAYED, JUSTICE DENIED

BY JIM DeBROSSE • ILLUSTRATION BY JONATHAN BARTLETT



SIX YEARS AFTER A LOCAL SPINE SURGEON FLED THE COUNTRY TO AVOID CRIMINAL PROSECUTION, HIS VICTIMS AND THEIR FAMILIES FIGHT FOR THEIR DAY IN COURT.

HOLLY DECAIR, A RECENTLY WIDOWED mother of two teenagers, was desperate to find relief from lower back pain caused by an inherited condition known as Ehlers-Danlos syndrome. EDS weakens the body's connective tissues, impacting the discs that cushion vertebrae in the spine. The 41-year-old Maumee, Ohio, native consulted with surgeons in Toledo and Cleveland, both of whom recommended she lose weight and try physical therapy before exposing herself to the risks of spinal surgery.

In 2009, DeCair learned of a clinic at Cincinnati Children's Hospital Medical Center (CCHMC) that specialized in the treatment of EDS for both children and adults. A doctor there referred her to local surgeon Abubakar Atiq Durrani, M.D., whose aggressive and often experimental surgeries had been questioned and criticized by other surgeons at CCHMC. In fact, Durrani had left CCHMC earlier that year under a cloud of complaints about his professional and personal conduct that were never communicated to his patients or other hospitals. He assured DeCair that "he could take care of her. It would just be a normal surgery, and it was no big deal," recalls her sister, Jodi Behrendt.

DeCair's surgery was one of 10 that Durrani performed that day in August 2009 at The Christ Hospital, Behrendt says, and it was anything but routine or standard. His plan was to fuse together the lower vertebrae of DeCair's spine with a costly and controversial bone grafting material called BMP-2 that he'd used on hundreds of his patients without their consent.

To hold the spine in place while the bones grew together, Durrani inserted screws through them. But the first screw was too long and pierced the iliac artery that runs along the front of the spinal column. He removed the screw, quickly tried to patch the cut, and inserted a shorter one. But with the artery still bleeding out, Durrani sewed up DeCair and went out to the waiting room to tell her family that the surgery had been a success.

In the recovery room, though, DeCair was struggling for life. Her heart stopped from loss of blood, and she was rushed back to surgery, this time under the care of a vascular surgeon who made a heroic effort to stop the bleeding. But after a total of 64 blood transfusions—replacing all the blood in DeCair's body—her heart gave out and she died. Her children no longer had a father or a mother.

"I understand the risks of surgery and that things do happen," says Behrendt, who is a surgical nurse in Toledo. "But with [Durrani] it was not a one-time thing. If you look at the number of people he operated on and the number of people he maimed and killed, it's huge."

From 2005 until he fled to his native Pakistan in 2013 to avoid criminal charges of health care fraud, Durrani performed an estimated 4,000 surgeries at CCHMC, UC West Chester, Christ, and Good Samaritan hospitals as well as Dayton's Riverview Health Institute, bringing in millions of dollars in revenue. But hundreds of the surgeries are alleged to have been unnecessary and many were botched, leading in some cases to death and at least four instances of paralysis, according to court depositions. And even though colleagues and nurses began raising concerns about Durrani's practices as early as 2006, the long line of unsuspecting patients he operated on—as many as 11 per day as he rotated through multiple operating rooms—were never warned. Court testimony alleges that, at times, Durrani would leave two or three surgeries in the hands of unsupervised residents while he retreated to his office with his physician assistant, with whom he was having an affair.

> SINCE DURRANI'S FLIGHT IN 2013, MORE THAN 50 OF HIS FORMER PATIENTS HAVE DIED AWAITING THEIR DAY IN COURT.

Durrani's story uncovers a dark underbelly of today's U.S. health care system, which often protects physicians and hospitals over patients, rewards aggressive treatment over successful outcomes, allows medical device companies to hire doctors who use their products, and encourages hospitals to look more closely at their bottom line than the competence of the doctors they hire and supervise. It also intersects with an Ohio court system that's vulnerable to outside money and influence.

More than 500 lawsuits have been filed against Durrani and the hospitals at which he operated. Many of the cases against the hospitals have been settled out of court, while victims and their families continue to seek justice in personal lawsuits against Durrani. Only 25 of those have progressed as far as a verdict, with juries awarding a total of more than $86 million to victims. The remaining cases are being heard one at a time in Hamilton County Common Pleas Court, despite a push for group or class action status. Since Durrani's flight in 2013, more than 50 of his former patients have died awaiting their day in court.

DONNA RISTER DIED IN 2017 AT AGE 64 OF A MASSIVE infection after a series of radical operations by Durrani left her wheelchair-bound. From 2010 to 2012, Durrani performed four separate

Case: 1:20-cv-00813-SJD-KLL Doc #: 1-1 Filed: 10/16/20 Page: 4 of 8 PAGEID #: 33



**LITTLE COMFORT** MELISSA MORGAN AND HER SON JACOB COTTER WERE AWARDED $2 MILLION IN DAMAGES IN A LAWSUIT AGAINST CINCINNATI CHILDREN'S HOSPITAL MEDICAL CENTER AFTER DURRANI BOTCHED COTTER'S SURGERY THERE IN 2008.

surgeries on Rister for back pain, including fusion of her spine and the insertion of rods. But each surgery only made matters worse until she was stooped over and could no longer walk or drive, says her husband, Gordon. Durrani had placed so many wires into her spine they could be seen poking through the skin of her back.

Rister says he couldn't talk his wife into a second opinion "because she was stuck on him. She told me, 'He was so damned good-looking he could cut my head off and I wouldn't care.'" Tall, dark, neatly mustached, and always impeccably dressed, Durrani was described by one of his former patients as "a Pakistani Freddie Mercury." But Gordon Rister calls him "another Mengele," the infamous Nazi physician who performed deadly experiments on Auschwitz prisoners.

Little is known for certain about Durrani's past, except that he lied consistently about his background and credentials, beginning with his medical training. He claimed on his applications for medical licenses in Kentucky, Ohio, and Texas to have graduated from two different medical schools in Pakistan, giving graduation dates in 1990, 1991, and 1996. All three fall after his claim to have passed the National Board of Medical Examiners test in Cairo, Egypt, in September 1990. Then comes a five-year gap in his résumé, picking up again in 1997 in London, where he trained at the Royal National Orthopedic Hospital. A doctor in London who knew the renowned CCHMC orthopedic spinal surgeon Alvin Crawford, M.D., wrote to Crawford recommending Durrani to his attention.

Crawford at the time was looking for a protégé to follow in his footsteps as head of pediatric spine surgery at CCHMC, and Durrani, who oozed self-confidence and charm, became his chosen one. He was accepted in 1999 for a residency in orthopedic surgery training at the University of Cincinnati, completing it in 2003 with an "average" rating. Crawford offered Durrani a post in CCHMC's surgery department and became his defender and protector as other doctors and nurses eventually refused to work with Durrani.

"Dr. Crawford was in a sad and conflicted position with a young man who was commonly referred to as his son," according to lawsuit testimony by Charles Mehlman, M.D., a respected spinal surgeon at CCHMC and perhaps the first to complain to supervisors about Durrani's unorthodox and dangerous practices. "[Crawford] had a special liking, a special attachment to Dr. Durrani through the years. And at the tail end of things as this thing unfolded, I have it on very good authority that [Crawford was] moved to the point of tears as he reflected on his own poor judgment with Dr. Durrani," Mehlman testified.

As Durrani's surgery caseload grew at CCHMC and other hospitals, so did the hospitals' accommodations to make certain he had as much staffing support and access to operating rooms as he needed to bring in patients and revenue. Nurses at CCHMC testified they had never seen other surgeons there given such special treatment, including simultaneous scheduling of two or even three operating rooms per day. Mehlman testified that CCHMC "built a machine" around Durrani that included referrals from its clinics, and it showed on the bottom line. Durrani's total billings at CCHMC more than doubled from $1.5 million in 2005 to $3.6 million in 2008, according to hospital data. He was known by administrators to be the top revenue producer in the hospital's entire surgical department.

Durrani was also making money for MedTronics, manufacturer of the bone grafting material BMP-2, which had hired him as a consultant. Sold under the brand name Infuse, BMP-2 was found to have 10 to 50 times more side effects than the company originally reported, including • CONTINUED ON PAGE 114

PHOTOGRAPH BY AARON M. CONWAY

## JUSTICE DELAYED, JUSTICE DENIED
CONTINUED FROM PAGE 65



an increased risk of cancer. Even though the FDA warned that BMP-2 should not be used in children, Durrani did so on a regular basis.

Maureen Grady, one of Durrani's nurses, testified that in 2006 he began to significantly ramp up the volume of his surgeries and the workload for his exhausted staff, in part by persuading his patients that surgery was the only solution to their problem. That included hundreds of student athletes with lower back pain caused by physical stress and small congenital fractures in their vertebrae. By the best standards of medical care, the vast majority of those patients can be treated successfully without surgery by taking time off from their sport and doing physical therapy—but with Durrani operating at CCHMC, "we reached a point where four kids a day were having that surgery," Mehlman testified. "I haven't done four in my career." There was also "an explosion of TLIF" operations, a type of lower spinal fusion done primarily on adults with degenerative conditions, but Durrani was performing them on "young teenagers," Mehlman stated.

Durrani would lie to his patients about how much experience he had with a particular procedure, two of his nurses testified. And he would often scare his patients into surgery, regardless of the risks and whether or not it would help their condition. He told his patients with EDS, the condition DeCair suffered from, that their heads would fly off during a car accident if they didn't have their spines fused.

Like so many of Durrani's patients, Thomas Atkinson went forward with surgery. "He was a man of black and white in a system that offers you 1,000 shades of gray," says Atkinson, 61, of Anderson Township. "Durrani strode into the [examining] room like a colossus. Your X-ray was up on the panel. He walked up to it and he went, 'That's your problem, and I can fix it.'" But when Atkinson asked in the recovery room how a second, more aggressive surgery had gone, Durrani looked visibly shaken and told him and his wife, "I hope I never have to do that again."

Dana Setters, too, was told she was at risk of literally losing her head when she came to Durrani complaining of lower back pain. He performed an experimental surgery on her neck that left her head tilted to one side and her neck permanently immobilized. "He told me all of that was normal" after the surgery, says Setters, 34, of Middletown. She now needs the help of her mother to raise her young daughter. Last year, a Hamilton County jury awarded her $984,906 in compensatory damages in her lawsuit against Durrani. (Compensatory damages in verdicts against Durrani are payable from his medical malpractice insurance policy. Plaintiffs' attorneys have hired an attorney in Pakistan to pursue additional amounts from Durrani's personal assets there, if any.)

In 2006, Mehlman began complaining to his supervisors at CCHMC, including Crawford, who had been his surgical mentor as well as Durrani's; Eric Wall, M.D., who was then in charge of orthopedic surgery at CCHMC; and the hospital's patient safety officer, Steve Muething. But by mid-June of that year, according to Mehlman's deposition, Wall told him, "Chuck, you've been asked to be quiet." Wall wouldn't say by whom.

→ **THE CHORUS OF COMPLAINTS ABOUT** Durrani grew dramatically over the next year. Radiologists questioned his readings of patient X-rays. Other surgeons and residents raised concerns during weekly patient review sessions about his unorthodox practices, all of which Durrani simply shrugged off before ending his attendance at the meetings altogether. Insurance companies began refusing to pay for his unorthodox and unnecessary treatments, especially the use of BMP-2, for which MedTronics charged $5,000 to $10,000 per vial.

Surgical nurses at Children's complained about the volume and improper diagnoses of his patients and whether there was enough staffing to give his patients the attention they needed. Nurses and administrative staff at nearly every hospital where he worked complained that Durrani wasn't signing patient orders, wasn't dictating his post-surgical notes, and wasn't completing discharge records—all requirements of maintaining hospital staff privileges. Administrators would impose suspensions on those privileges but let Durrani continue to operate anyway.

Several nurses at CCHMC, fed up with the stressful workload and Durrani's shady medical practices, simply quit working for him. Orthopedic surgical nurse Gari Ann Dunn testified that the answer from department supervisors at CCHMC to continuing complaints about Durrani was always, "We're trying to take care of it." But Durrani kept on operating and bringing in revenue.

Durrani's personal behavior also became a popular topic among nurses and doctors at CCHMC. He would claim particular nurses solely as his own even though they worked for the entire department. He hired the mother of a patient right out of the waiting room, with no job interview, because he was smitten with her looks.

Durrani told several nurses he was a "prince" in his native Pakistan, even though the monarchy there was abolished in 1956. He once ordered a Lamborghini over his cell phone during a lunch break while others listened. He bragged about building a salt water pond in the backyard of his $1.2-million six-bedroom, six-bath mansion in Mason and stocking it with penguins for his two children.

But what became perhaps his final undoing was the affair he began with his physician assistant. Durrani made no at-

> **SURGEON CHARLES MEHLMAN, M.D., WHO COMPLAINED ABOUT DURRANI'S UNNECESSARY SURGERIES, SAYS HE WAS TOLD, "CHUCK, YOU'VE BEEN ASKED TO BE QUIET."**

tempt to hide the affair from his staff and often met privately with her in his office to have sex, even during scheduled surgeries. When a medical equipment sales representative once asked the assistant out for a date, Durrani instructed a nurse to tell the rep "hands off." Supervisors finally moved the assistant to another department in 2008 to break up the work-hours tryst.

Durrani resigned from CCHMC in August 2008, citing what he called an "inhospitable atmosphere," and announced he was launching his own treatment facility, the Center for Advanced Spine Technologies (CAST) in Mason. Even after his resignation, which officially took effect on January 1, 2009, Durrani performed hundreds of additional surgeries at CCHMC through March of that year.

A trio of concerned doctors at the University of Cincinnati decided that the state medical board should be notified before Durrani harmed more patients. In October 2009, they drafted and redrafted a letter to the board president detailing their concerns, including Durrani's unnecessary surgeries on children. In a deposition, Anthony Guanciale, M.D., said that after they consulted with a lawyer for UC, who warned them they could be sued by Durrani, the letter was never sent.

Nor did any Cincinnati hospital submit Durrani's name to the National Practitioner Data Bank, a federal clearinghouse designed to protect patients from incompetent doctors. A study by Public Citizen, a nonprofit consumer advocacy organization, found that 49 percent of all hospitals in the country didn't report a single sanction against their doctors to the NPDB from 1990 to 2007.

CCHMC's Medical Executive Committee, composed of hospital physicians who review their peers, "is a relic," testified Elaine Billmire, M.D., who served on the committee during the years Durrani was on staff. "It's really the hospital executives, the board [of directors] who decides" when a doctor is disciplined or fired. "The hospital has not been handling doctors professionally.... And that means both giving them the respect they deserve and also dealing with serious problems as they should be."

The many complaints against Durrani at CCHMC could have stopped with Richard Azizkhan, M.D., then director of surgery, who alone had the power to discipline or to fire him in consultation with the hospital's then-CEO James Anderson. But Azizkhan's salary and bonuses were based on expanding the surgical staff and the revenue they produced for the hospital. He did nothing. (Azizkhan was let go by current CEO Michael Fisher in early 2015 and became president of Children's Hospital and Medical Center in Omaha, Nebraska. In January, two Omaha surgeons sued Azizkhan, claiming he had retaliated against them for questioning the performance of another surgeon. Ten physicians resigned from the hospital's staff in protest.)

The tide at last began to turn against Durrani in 2013 after more than a dozen of



## Welcome to Parenthood 2.0.

### The last two decades have gone by in a blur...What now?

Whether it's kids heading off to college, retirement, divorce, selling a business, or starting a new one... change is inevitable.

**At Bartlett, we help you transform life's transitions into possibilities.**

**GET OUR FREE GUIDEBOOK**
*Changes That Impact Your Wealth (and What to Do About It)*
**Bartlett1898.com/changes**

**Bartlett** WEALTH MANAGEMENT

513.621.4612 | BARTLETT1898.COM

his patients and their families turned for legal help to Eric Deters, a local personal injury lawyer known for being outspoken and controversial—enough so that he was suspended for unethical behavior by both the Kentucky and Ohio bar associations. Deters says he saw the pattern in Durrani's exaggerated diagnoses and lying about the need for surgery. He called a press conference in February 2013 to air client complaints, and three TV stations showed up. Within a week, an additional 150 plaintiffs poured in.

But Durrani wasn't truly stopped until he was arrested by the FBI on July 25, 2013, and indicted on charges of performing unnecessary surgeries and billing Medicare, Medicaid, and private insurers for those fraudulent services. With that news, 400 more clients came knocking at Deters's offices in Cincinnati and Northern Kentucky. Finally, Durrani began losing his hospital privileges and medical credentials. Sometime in mid-December 2013, he fled to Pakistan, leaving behind his wife and children. Both Ohio and Kentucky permanently revoked his medical licenses by April 2014, and his wife divorced him in absentia that September.

Durrani continued to perform spine surgeries in Pakistan, according to news reports there. He can't be forced to return and face his accusers, because the U.S. and Pakistan don't have a reciprocal extradition treaty. His Florence-based attorney, Michael Lyon, says he can't comment while the lawsuits against his client remain pending. Spokespersons for CCHMC and UC Health West Chester say the hospitals don't comment on litigation, and Ethan Fallang, CEO of Riverview Health Institute, declined to comment due to a court-imposed gag order. Calls to The Christ Hospital, Good Samaritan Hospital, and Children's Hospital in Omaha were not returned.

→ **DETERS'S FIRM HAS FILED MORE THAN** 500 lawsuits in all against Durrani and the hospitals where he operated—most of the cases in county court, some in federal court. In December 2015, Hamilton County Common Pleas Judge Robert Ruehlman ordered all of the county cases to be tried in groups and completed by the end of 2017.

But then a funny thing happened. The Chief Justice of the Ohio Supreme Court, Maureen O'Connor, intervened and removed Ruehlman from the consolidated cases in Hamilton County. The cases were dispersed to several different Hamilton County judges and were again moving forward to trial when O'Connor reassigned them all to a retired Belmont County judge, whom she replaced six months later with retired Hamilton County Judge Mark Schweikert. O'Connor has never given a public explanation for her intervention in the Durrani cases. Deters's firm filed a federal lawsuit, still pending, asking that O'Connor and Schweikert be removed from the cases for bias.

Of the $3.8 million in campaign donations toward her elections to the Supreme
Case: 1:20-cv-00813-SJD-KLL Doc #: 1-1 Filed: 10/16/20 Page: 7 of 8 PAGEID #: 36



THE FROG princess

MUSIC & LYRICS BY DAVID KISOR

BOOK BY JOSEPH McDONOUGH

Hop into the holiday season!

FAMILY-FRIENDLY MUSICAL
DEC 4 – JAN 4

ENSEMBLE THEATRE CINCINNATI
513.421.3555
ENSEMBLECINCINNATI.ORG

SEASON PRESENTING SPONSOR
The Otto M. Budig Family Foundation

SEASON FUNDER
artswave

OPERATING SUPPORT
Ohio Arts Council

Court since 2002, O'Connor received half from the legal, medical, and insurance industries. Those donations include $84,000 from the law firms defending CCHMC, Christ, UC West Chester, and other accused hospitals in the Durrani trials, according to data from FollowTheMoney.org, a nonpartisan watchdog group that tracks political donations.

O'Connor has maintained over the years that campaign donations don't affect her decisions. In 2006, though, a *New York Times* study found that Ohio Supreme Court justices ruled in favor of their donors in 70 percent of cases. Unlike a dozen other states, including Michigan, Ohio has no system for forcing judges to recuse themselves from litigation in which their donors are involved. As a result, "they don't step away from cases that many ordinary people would expect that they would," says Catherine Turcer, executive director of Common Cause Ohio, which advocates for more transparency in government.

In 2002, O'Connor won her first election to the Ohio Supreme Court after an onslaught of insurance-backed campaign ads warned that insurance premiums would soar if she weren't elected to control medical malpractice claims. A year later, O'Connor was the featured speaker at a conference sponsored by the Ohio State Medical Association, where she proudly announced to the doctors in attendance, "What I will never forget and always want to recall in sharp focus is the support I received from physicians in the state of Ohio."

After assuming control of the Durrani cases in August 2017, Schweikert refused to allow group trials, as Ruehlman had done and as Judge Michael Barrett had permitted in federal district court. And with O'Connor providing no additional resources to Hamilton County to handle hundreds of cases individually, Deters estimates it will take decades for the victims' cases to be heard one at a time.

Even so, Deters's firm has been winning for his clients: 17 awards of monetary damages out of the 25 cases decided so far. In September 2018, UC's West Chester Hospital settled with more than 350 of Deters's clients for an undisclosed sum. In May, CCHMC agreed to an undisclosed settlement with 475 clients. Still outstanding are 100 cases at The Christ Hospital, six at Good Samaritan, and four at Riverview. At one point, Schweikert indicated that he would be willing to consider group trials, but in August he issued a ruling saying he's still opposed to group trials unless the plaintiffs and defendants can agree to specific terms for the groupings—effectively giving Durrani's attorney veto power.

Melissa Morgan of Middletown waited five years to have her case heard against CCHMC for failing to warn her about Durrani in 2008. She says the surgeon "bullied" her into allowing a radical and unnecessary surgery on her son, Jacob Cotter. Durrani had resigned from CCHMC six weeks earlier, but was still allowed surgical privileges at the hospital.

Cotter was born with abnormally fused spinal bones in his neck. Durrani insisted the boy, then age 11, needed surgery to fuse bones near the top of his spinal column. He threatened to report Morgan to children's protective services if she didn't comply, she says.

During the surgery, Durrani improperly inserted a screw that lodged against Cotter's spinal column. The screw can't be removed without causing further damage. Cotter has been in constant pain ever since and on so much medication he sleeps most of the day, says Morgan. Although he has a passionate interest in history, the now-22-year-old dropped out of college because he couldn't stay awake during classes.

An eight-person jury voted unanimously in 2018 that CCHMC pay the family $2 million in compensatory damages. Morgan says the outcome of her son's case has made clear "that Durrani was in the driver's seat, and whatever Durrani wanted was done. Everybody else at Children's was just riding the bus."

But the jury award means little, she says, when she and Cotter "face the reality every day" that a sudden blow of any kind to his neck or head could crack his spine and likely kill him. "I often wonder if my son dies, could they re-indict [Durrani] for murder," says Morgan. "In my eyes, that's what he would deserve."◉



# FEEDING LOCAL FAMILIES



Catholic Charities' **Food for All** partners with social service agencies and churches in rural areas across eastern counties of the Archdiocese of Cincinnati to address hunger in food deserts.

**GIVE ONLINE TODAY AT**
www.ccswoh.org.
A gift of $100 feeds 5 families of 4 for a week.


Catholic Charities Southwestern Ohio
Serve | Enlighten | Empower


United Way of Greater Cincinnati | AGENCY PARTNER