# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| **CHARLES T. MEHLMAN** | : | **Case No.: 1:20-CV-813** |
| | : | |
| | : | **Judge Susan J. Dlott** |
| | : | |
| **Plaintiff,** | : | |
| | : | **RESPONSE IN OPPOSITION TO** |
| | : | **DEFENDANTS' MOTION TO DISMISS** |
| **v.** | : | **PLAINTIFF'S COMPLAINT** |
| | : | |
| **Cincinnati Children's Hospital Medical** | : | |
| **Center,** *et al.* | : | |
| | : | **(ORAL ARGUMENT REQUESTED)** |
| **Defendants.** | : | |

Comes now Plaintiff Doctor Charles T. Mehlman ("Dr. Mehlman"), by and through counsel, and hereby respectfully submits his Response in Opposition to Defendants Cincinnati Children's Hospital Medical Center ("CCHMC"), Richard M. Ruddy, M.D., and Daniel von Allmen (collectively referred to as "Defendants")' Motion To Dismiss Plaintiff's Complaint.

Respectfully submitted,

**STATMAN, HARRIS & EYRICH, LLC**

**/s/ Alan J. Statman**
Alan J. Statman (0012045)
Sylvie Derrien (0072579)
Executive Building
35 E. 7th Street, Suite 315
Cincinnati, Ohio 45202
Phone: (513) 621-2666
Facsimile: (513) 621-4896
E-Mail:  ajstatman@statmanharris.com
         sderrien@statmanharris.com
*Attorneys for Plaintiff, Dr. Charles T. Mehlman*

1

# I.     INTRODUCTION

Unsurprisingly, Defendants seek to hide behind the shield of the Health Care Quality Improvement Act ("HCQIA"), 42 U.S.C. § 11111 and Ohio law (Ohio Revised Code "ORC § 2305.251(A)) to escape liability for the insidious pattern of retaliatory actions to which they have subjected Dr. Mehlman since he started voicing concerns about the dangerous and fraudulent practices of a rogue spine surgeon, the now infamous Doctor Durrani ("Durrani") who, in 2013, was indicted by a federal grand jury on ten counts of Medicare and Medicaid fraud related to unnecessary surgeries.[1]

However, Defendants jump the gun. Neither the HCQIA nor the Ohio statute are as an impenetrable shield as Defendants want them to be, and certainly not at the motion to dismiss stage. It is no coincidence that Defendants do cite to any specific case in support of their immunity defense addressing motions to dismiss. In fact, they do not as to the other claims either. As to those remaining state law claims, Dr. Mehlman has "plead factual content that allows the court to draw the reasonable inference that [Defendants are] liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868, (2009). Accordingly, dismissal of Dr. Mehlman's Complaint is not appropriate at this stage of the proceedings.

# II.     FACTUAL SUMMARY

Dr. Mehlman is licensed to practice medicine in the State of Ohio and has been employed by CCHMC as a pediatric orthopedic surgeon, since 2002. Dkt. No. 1, PageID #4 at ¶¶ 7-8. His Contract provides that Dr. Mehlman shall be a full-time employee, comply with all policies, procedures, rules and regulations of [CCHMC] and with all legal and ethical standards relating to

---

[1] Capitalized words not otherwise defined herein shall have the meaning ascribed to them in Plaintiff's Complaint. Dkt. No. 1.

the practice of medicine. *Id*.at #10. It also provides for Dr. Mehlman to be able to exercise at all time his free and independent judgment as it related to the care of his patients. *Id*., at ¶¶ 9-11. Finally, Section 18(j) provides that "in the event of any dispute arising out of or relating to this Agreement" the complaining party is to give notice of a disagreement and allow the other party 15 days to respond. *Id*., at ¶ 12.

Durrani was employed first as a resident in training and then as an attending surgeon in the Department of Pediatric Orthopedic Surgery at CCHMC. Dkt. No. 1, PageID #5 at ¶¶ 15-17. Public court filings indicate that at least five plaintiffs filed lawsuits in the Hamilton County, Ohio Court of Common Pleas, naming him as a defendant during the course of his residency. *Id*. at ¶17. After he resigned, CCHMC allowed Durrani to continue to perform 28 surgeries resulting in some of the most egregious and preventable harm to patients. *Id.* at ¶¶17-18. At no time during his tenure, did Defendants suspend Durrani's privileges. *Id*. at Page#ID 6, a¶20.

Drs. Ruddy and von Allmen are physicians employed by CCHMC, members of the MEC and the PPEC. *Id*., at PageID 3,6,7, ¶¶3-4, 23, 29. Both Dr. Ruddy and Dr. von Allmen initiated and/or participated in the PPEC actions against Dr. Mehlman, culminating in Dr. Mehlman's suspension of privileges.[2]

As Dr. Mehlman grew increasingly concerned about the medical treatment and care provided by Durrani at CCHMC, he repeatedly made his concerns about Durrani known orally and in writing. *Id.*, at PageID# 10,11, at ¶¶40-47. Dr. Mehlman brought concerns about physician competency, unnecessary and/or dangerous and/or unapproved experimental procedures to

---

[2] These included but are not limited to at least nine instances, January 15, 2015, March 24, 2016, July 13, 2016, October 7, 2016, November 30, 2017, January 11, 2018, February 9, 2018, February 23, 2018, and March 23, 2018. *Id*., at PageID # 7, 9 ¶¶ 23, 29,30. As the pattern of retaliation against Dr. Mehlman became clear, on March 28, 2018, Dr. Mehlman's former counsel sent a formal letter to William Ford, III, Senior counsel at CCHCM notifying CCHMC of the pattern of retaliation against Dr. Mehlman. *Id.*, at PageID 7,8, ¶¶ 24, 31.

CCHMC peer review meetings in order to ensure that the procedures, some of which resulted in additional surgeries and even spinal cord injury/paralysis be investigated. *Id.*, at PageID 10, ¶ 41. However, Dr. Mehlman's demands for accountability led to complaints about him from senior management at CCHMC supporting Durrani due to his generation of revenue and led eventually to Dr. Mehlman's being suspended. *Id*., at ¶¶ 42-43. Although Dr. Mehlman brought the issue of unnecessary, risky and/or unapproved procedures to the attention of CCHMC executives and Defendants in particular, they continued to submit claims to the Federal Government for reimbursement in violation of the fraud and abuse laws. *Id*., at PageID #10-11, ¶¶42-44. Dr. Mehlman repeatedly brought his concerns over the significant number of patient, physician and nurses complaints regarding deficient quality of care and overall negative customer service to the attention of Defendants, but his concerns were ignored. *Id*., at PageID #11, ¶45. Instead, as a result of his continued efforts to alert CCHMC executives, and Defendants in particular, that these complaints were serious and had to be addressed, Defendants responded by systematically, retaliating against and, eventually suspending Dr. Mehlman. *Id.*

In October 2012, as Dr. Mehlman was facing depositions related to Durrani's misconduct, CCHMC's PPEC raised concerns about Dr. Mehlman's behavior **unrelated to patient care**, despite no concerns having existed or been raised at any time **during the previous 14 years of his employment**.[3] *Id*., at PageID #14, ¶55. Shortly thereafter, Dr. Mehlman discussed the alleged concerns raised with the PPEC and agreed to undergo counseling with a psychologist for his alleged communication issues. *Id*., at ¶56.

Less than two weeks after federal agents interviewed Dr. Mehlman about Durrani's actions which resulted in his indictment, Dr. Peter Sturm, Director of Crawford Spine Center, and Dr.

---

[3] These issues related to interacting with operating room personnel who were extremely unfamiliar with Dr Mehlman and the surgeries that he was performing.

Frederick Ryckman, Sr. Vice President of Medical Operations, met with Dr. Mehlman and accused him of engaging in "abusive conversations, demeaning comments, and insulting comments" with orthopedic and urology operating room staff. *Id*., PageID #14, ¶60. *Five days later*, on August 12, 2013, PPEC Ellis Arjmand and Daniel von Allmen met with Dr. Mehlman regarding the same alleged staff issues. *Id*., at PageID #15, ¶61.

Between late 2013 and 2015, hundreds of medical malpractice suits were filed against Dr. Durrani, over 80 of which also included CCHMC as a party defendant. *Id*., at ¶63. Although numerous requests to depose him were sent to CCHMC, through counsel, Dr. Mehlman was never notified. *Id*., at ¶64. Coincidentally, Dr. Mehlman was reprimanded after CCHMC counsel finally notified him that the Durrani plaintiffs sought to depose him. *Id*., at ¶65. PPEC has significantly increased the number of reprimands issued to Dr. Mehlman since the onslaught of Durrani lawsuits emerged in 2013-2015. *Id*., at ¶66.

During late 2017 and early 2018, as another case involving Durrani and CCHMC as defendant moved through discovery, Dr. Mehlman received additional reprimands from the PPEC. *Id*., at PageID #16, ¶70. On February 22, 2018, Frederick Johnson of Deters Law Firm filed a motion to compel Dr. Mehlman's deposition for "all Children's cases on the issue of Children's liability." *Id*., ¶71. Once Dr. Mehlman's deposition became imminent, Defendants escalated their behavior towards him. *Id*., at ¶72.

On March 23, 2018, Dr. Mehlman was placed on a PIP and threatened to be referred to the MEC if he did not "cooperate." *Id*., at ¶73. Dr. Mehlman had already addressed the concerns at issue, which were unrelated to his communication or standard and quality of care, undermining any basis for a PIP. *Id*., at ¶74.

Defendants' behavior towards and professional harassment of Dr. Mehlman prompted him to send a letter, through counsel, to Defendants, sharing his concerns that their actions were clearly retaliatory. *Id.*, at ¶75. On *June 15, 2018*, Dr. Mehlman testified against CCHMC by deposition under subpoena. *Id.*, at ¶76. *Less than 2 weeks later*, Dr. Ruddy, notified Dr. Mehlman that CCHMC was only extending his full, unrestricted clinical privileges for another six months. The standard extension throughout Dr. Mehlman's career has been 2 years. *Id.*, at PageID # 17, ¶77.

Following his deposition under subpoena, on or about August 31, 2018, CCHMC integrity and compliance personnel and CCHMC counsel contacted and met with Dr. Mehlman and his personal counsel regarding storage of Durrani-related patient information. *Id.*, at ¶78.

On *December 18, 2018*, Dr. Mehlman testified under subpoena, at trial in the matter of *Melissa Cotter, et al. v. Durrani and CCHMC*, Case No. A1406929. On *December 19, 2018*, the jury returned a verdict against Dr. Durrani and CCHMC, awarding over two million dollars in damages to Jacob Cotter for negligent credentialing and retention. *Id.*, at ¶¶79,80. On *December 20, 2018*, Dr. Mehlman met with PPEC, and was instructed to continue his job coaching sessions. PPEC also conveniently raised new concerns about how Dr. Mehlman handled a surgical consult for a five-year-old pediatric poly-trauma motor vehicle accident victim in early November. *Id.*, at PageID #18, ¶82.

In early *September 2020*, Dr. Mehlman raised concerns about patient safety in a manner reflecting his frustration and later acknowledged that he could have used more polite language. *Id.*, at PageID #19, ¶84. However, Defendants disciplined him by requiring periodic counseling.[4] He complied and intends to comply. *Id.*

---

[4] This event occurred 4 to 6 weeks after finalization of the settlement reached by CCHMC and the Durrani litigants.

On *September 18, 2020*, despite the discipline already imposed, Defendants again retaliated against Dr. Mehlman by suspending him for 2 weeks, beginning September 21, 2020. *Id*., at ¶85. That same day, Dr. Mehlman invoked his contractual right to dispute resolution regarding the suspension. In response, CCHMC breached his employment contract by failing to postpone the suspension, causing irreparable harm to Dr. Mehlman and forced the rescheduling of patients who were due for surgery, potentially jeopardizing their health and safety. *Id*., at ¶86.

Defendants have subjected Dr. Mehlman to retaliatory disciplinary action, including but not limited to, the PPEC allegations, complaints, counseling, the PIP described above, and the suspension on September 18, 2020, as well as retaliatory delay in the renewal of CCHMC's staff privileges at CCHMC. Each retaliatory action coincides with Dr. Mehlman exercising his right and duty to testify and/or report safety violations. The 14-day suspension imposed by Defendants on Dr. Mehlman has been reported to the State of Ohio Medical Board and will need to be disclosed in future applications for hospital privileges and/or membership. *Id*., at PageID #20, ¶¶87, 88.

As a result of the 14-day suspension, Dr. Mehlman has been unable to perform surgeries and cannot accept referrals to him from other physicians of patients who require the specialty services Dr. Mehlman is qualified to perform. Defendants 'retaliatory actions have damaged Dr. Mehlman professionally, financially and emotionally. *Id*., at ¶89

### III.  LEGAL STANDARD AND ANALYSIS

Dr. Mehlman adopts the legal standard enunciated by Defendants related to motions to dismiss. Applying this standard, Dr, Mehlman has alleged a compelling set of facts and his right to relief rises well above the "speculative level". *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544,555 (2007). Dr. Mehlman has plead "factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct.

1937, 173 L. Ed. 2d 868, (2009) (internal citation omitted). Nothing more is required of Dr. Mehlman at this stage of the case.

**A.** **Neither the HCQIA nor the Ohio Peer Review Statute shield Defendants from liability**.

    **(i)** **The HCQIA does nor provide immunity to Defendants**

Defendants move for dismissal of the Complaint arguing that they are immune from suit under the HCQIA, 42 U.S.C. § 11101, *et seq*., enacted by Congress in 1986 to address the perceived decline in the  quality of medical care, due to inadequate performance by incompetent physicians. 42 U.S.C. §§ 11101(1) and (2). The HCQIA was passed in order to "provide for effective peer review and interstate monitoring of incompetent physicians, and to grant *qualified* immunity from damages for those who participate in peer review activities." *Meyers v. Columbia/HCA Healthcare Corp*., 341 F.3d 461, 467 (6th Cir. 2003) (emphasis added).

The HCQIA provides immunity from damages for a "professional review action" taken by a "professional review body" if certain criteria for reasonableness are satisfied. 42 U.S.C. § 11111(a). The statute does not provide an immunity from suit. *Manion v. Evans*, 986 F.2d 1036, 1042 (6th Cir.), cert. denied, 510 U.S. 818, 114 S.Ct. 71, 126 L.Ed.2d 40 (1993). As the language of the statute indicates, it only provides for an immunity from damages. It states that qualified individuals and entities "shall not be liable in damages." 42 U.S.C. § 11111(a)(1).

To qualify for immunity under the HCQIA, the professional review action in question must satisfy four statutory requirements. First, it must be taken "in the reasonable belief that the action was in the furtherance of quality health care." 42 U.S.C. § 11112(a)(1). Second, it must be taken after "a reasonable effort to obtain the facts of the matter." 42 U.S.C. § 11112(a)(2). Third, it must be taken "after adequate notice and hearing procedures are afforded to the physician involved or after such procedures as are fair to the physician under the circumstances." 42 U.S.C. §

8

11112(a)(3). Fourth, the action must be taken "in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting" the preceding requirement. 42 U.S.C. § 11112(a)(4). The statute provides that an action is presumed to meet these requirements. 42 U.S.C. § 11112(a). This presumption may be rebutted, but only upon proof by the preponderance of the evidence that these standards were not met. *Id.*

The language of the statute speaks in terms of "*reasonable*" or "*adequate*," which are questions of fact. *Reyes v. Wilson Mem'l Hosp.*, 102 F. Supp. 2d 798, 811 (S.D. Ohio 1998) That these are questions of fact is clear from the language of the statute itself, which, as stated above, provides that a defendant's review actions are presumed to meet each of the four requirements. *Id.* This presumption may be rebutted upon submission of proof "*by a preponderance of the evidence.*" 42 U.S.C. § 11112(a). *Id.* Because questions of law do not turn upon the satisfaction of evidentiary burdens, it is clear that the reasonableness or adequacy of a particular review action is a question of fact, to be resolved by the trier of fact. Accordingly, it is premature on the part of Defendants to assume that they are entitled to immunity without allowing Dr. Mehlman to produce evidence that will create a triable issue of facts on one of the four elements in section 11112(a).

Therefore, Dr. Mehlman must be allowed to show by a preponderance of the evidence, that Defendants' actions were outside the scope of the protections afforded by § 11112(a)" *Meyers*, 341 F.3d at 468 (quoting *Bryan v. James E. Holmes Reg'l Med. Ctr.*, 33 F.3d 1318, 1333 (11th Cir. 1994)). "In a sense, the presumption language in HCQIA means that the plaintiff bears the burden of proving that the peer review process was not reasonable." *Bryan*, 33 F.3d at 1333 (emphasis in original). This he cannot do at this stage. As noted in the introduction, Defendants do not cite to any specific precedents decided on a motion to dismiss.

In any event, Dr. Mehlman has plead enough facts, which, when viewed in the light most favorable to him, entitle him to relief. In particular, Dr. Mehlman has established that the actions of Defendants were not reasonable under § 11112(a).

The Complaint clearly establishes a parallel between Dr. Mehlman's reporting of concerns and complaints about Durrani and Defendants' disciplinary actions. For the first 14 years of his career at CCHCM, Defendants did not report any concerns with Dr. Mehlman. Dkt. No. 1, at PageID # 14, ¶55. Then, as Dr. Mehlman's concerns and complaints about Durrani grew louder and moved from within the confines of the hospital to become public, Defendants' retaliatory actions became more severe to culminate in his September 2020 suspension. *Id*. at PageID # 10,11, ¶¶ 37,38,40,44,45,47.

Defendants' attempt to recast Dr. Mehlman as a disruptive physician so that their actions can fit the immunity framework under HCQIA fails to explain why such discipline precisely coincides with Dr. Mehlman's reporting of misconduct, complaints and testifying for the plaintiffs in the Durrani cases. Defendants construe Dr. Mehlman's explanation of the disciplinary actions to which he was subjected as his admitting to behavioral and professional issues. Dkt. No. 8, PageID # 190. This is not the case. Dr. Mehlman is merely highlighting how Defendants cloaked their actions in terms of discipline and seized every pretext and manufactured problems to try, in vein, to quiet him.

Yet, Defendants ignore that in all of his career, Dr. Mehlman never had a malpractice action filed against him, has been consistently listed among the "Top Doctors" in Cincinnati Magazine, an award bestowed by his peers and that his compliance with the required psychologist appointments NEVER resulted in any negative finding or psychological diagnosis. Of note, none of the complaints against Dr. Mehlman came from operating room staff that he works with

regularly. In fact, Dr. Mehlman's staff have routinely either become long-term members of his team (staying with him for anywhere from 10 to 17 years) or they have left the practice of other partners in order to get to work with him." Ironically, while a resident in training at CCHMC, Durrani had at least 5 lawsuits filed against him for malpractice. Dkt. No. 1., at PageID # 5, ¶16. This did not prevent CCHMC to hire him and retain him!

The facts and procedural posture of *Emlich v. OhioHealth Corp*., No. 2:14-cv-1697, 2016 WL 746536 (S.D. Ohio Dec 22, 2016), a case relied upon by Defendants are inapposite. First, the *Emlich* court was ruling on a summary judgment motion. Second, the Durrani saga is thankfully unique in both the legal and medical history of this country. It is a rather rare occurrence where a single physician has more than 500 lawsuits filed against him. Finally, and more importantly, the decision to terminate Dr. Emlich's privileges was the result of 8 years of *documented serious quality care concerns along with concerns regarding his professional conduct*. *Id*. at 2016 WL 7406536, at *3 (emphasis added). Further, the professional conduct concerns at issue were not the occasional all too human outbursts associated with the stress of a demanding job. They ranged from "a history of haphazard coverage arrangements," resulting in other physicians "having to step in to care for his patients," to a "history of failing to respond to pages and otherwise being unavailable when efforts are made to contact him." as well as "nine documented cases in the prior eighteen-month period in which Dr. Emlich failed to see his patients or failed to see them in a timely manner. *Id.* This is a far cry from what Dr. Mehlman is blamed for.

The HCQIA was not enacted to protect hospitals, professional review body and members from actions taken in reaction to a physician whistleblowing activities. *Clark v. Columbia/HCA Info. Servs., Inc*., 117 Nev. 468, 480, 25 P.3d 215, 223 (2001) (denying summary judgment finding that "the record indicates that the primary concern of respondents in their deliberations was his

whistleblowing activity. …Moreover, it appears that the board's decision was influenced by the history of numerous reports made by Clark, and its displeasure with his decision to go outside of the hospital's internal processes.) It is ironic to think that Defendants went to great length to protect a surgeon they knew was endangering and did endanger the life and well-being of his patients while at the same time quieting the doctors who sought to achieve the very aims of the HCQIA. Defendants' very own malicious actions undermine their arguments that the actions they took vis a vis Dr. Mehlman were in further of the HCQIA.

**(ii)    Defendants are no immune under Ohio law.**

In addition to alleging that they are immune from liability under the HCQIA, Defendants also seek protections under Ohio law for all of Dr. Mehlman's state law claims. Section 2305.151 of the Ohio Revised Code ("ORC") provides in relevant part:

> No health care entity shall be liable in damages to any person for any acts, omissions, decisions, or other conduct within the scope of the functions of a peer review committee of the health care entity. No individual who is a member of or works for or on behalf of a peer review committee of a health care entity shall be liable in damages to any person for any acts, omissions, decisions, or other conduct within the scope of the functions of the peer review committee.

> ORC § 2305.251 (A).

> No person who provides information under this section without malice and in the reasonable belief that the information is warranted by the facts known to the person shall be subject to suit for civil damages as a result of providing the information.

ORC § 2305.251 (D). Immunity under O.R.C. § 2305.251 may be defeated by a showing of actual malice. *Vistein v. Am. Registry of Radiologic Technologists*, 509 F. Supp. 2d 666, 677 (N.D. Ohio 2007), aff'd in part, rev'd in part, 342 F. App'x 113 (6th Cir. 2009) (internal citations omitted).

The Complaint sets forth enough facts to suggest that Defendants acted with malice.  Each disciplinary action coincided with Dr. Mehlman's reporting misconduct by Durrani or participating in legal proceedings. *See* Section III(A)(i) above. Defendants knew that the reasons

for disciplining Dr. Mehlman were pretextual and disregarded the truth in order to cover their own misconduct. *Wall*, 119 Ohio App. 3d at 666. Accordingly, dismissing Dr. Mehlman's state law claims om the basis of state law immunity at that stage is premature and he should be allowed to proceed to discovery to produce further evidence of malice.

**B. Dr. Mehlman has pleaded enough facts to support all the claims in the Complaint**

**(i) Dr. Mehlman has stated a claim under the FCA**

Defendants claim that Dr. Mehlman's FAC claim fails must be dismissed because he fails to allege that he was engaged in protected conduct. Dkt. No. 8, PageID # 194. Defendants misread the Complaint and the law.

The Sixth Circuit has interpreted protected activity broadly. *U.S. ex rel. McKenzie v. Bellsouth Telecomms., Inc.*, 123 F.3d 935, 944 (6th Cir.1997) (internal citations omitted). It has defined protected activity" to mean "acts done ... in furtherance of ... an action filed or to be filed under [§ 3730(h)]." *McKenzie*, 219 F.3d at 515. The "in furtherance of" language requires the plaintiff to be "investigating matters that reasonably could lead to a viable False Claims Act case." *Id*. In addition, a qui tam action may still survive if the employee adequately alleges his employer was aware he was contemplating pursuing a qui tam action under the FCA. See *McKenzie*, 123 F.3d at 944–45 (dismissing the plaintiff's qui tam action, but finding that her retaliation claim survived dismissal). Thus, retaliation claims under § 3730(h) are not dependent on a plaintiff's ability to succeed on, or even file, a cause of action under § 3729. U.S. *Georgandellis v. Holzer Clinic, Inc.*, No. 2:08-CV-626, 2009 WL 1585772, at *9 (S.D. Ohio June 5, 2009) citing *United States ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1522 (10th Cir.1996) ("[t]he case law is clear that a retaliation claim can be maintained even if no FCA action is ultimately successful or even filed").

Dr. Mehlman has alleged numerous retaliatory disciplinary actions to support his FCA claim starting with his reporting Durrani's misconduct to Defendants and questioning their condoning such misconduct. Dkt. No. 1, PageID ## 10-11 ¶¶ 41,42, 44, 45, 47 (concerns about Durrani's, use of experimental surgical procedures on children, booking two operating rooms simultaneously; questioning physician competency and unnecessary and/or dangerous and/or unapproved experimental procedures to CCHMC peer review meetings in order to ensure that the procedures, some of which resulted in additional surgeries and even spinal cord injury/paralysis be investigated; submitting claims to the Federal Government for reimbursement in violation of the fraud and abuse laws; concerns over the significant number of patient, physician and nurses complaints regarding deficient quality of care and overall negative customer service. These amount to health care fraud, waste, and abuse and violations of patient care standards that are material to the payment of government dollars.

Defendants' retaliatory actions against Dr. Mehlman escalated as it became clear that despite their efforts to block his deposition, he would testify in court. Dkt. No. 1, PageID #13, Section 6. This prompted Dr. Mehlman to send a letter, through counsel, to Defendants, sharing his concerns that their actions were clearly retaliatory. *Id.* at PageID #16. ¶75.

Defendants' argument that Dr. Mehlman does not allege that his reporting fraud was the cause of the retaliatory action against him is disingenuous. As detailed above, Dr. Mehlman has repeatedly complained to Defendants about their supporting Durrani's misconduct amounted to defrauding the United States government such that Defendants should have known that he could have been contemplating a pursuing a FCA case. See *Georgandellis v. Holzer Clinic, Inc.*, No. 2:08-CV-626, 2009 WL 1585772, at *12 (S.D. Ohio June 5, 2009) (Based on Georgandellis's multiple and repeated reports to defendants that they were defrauding the United States

government by billing for Swanson's "worthless services," the Holzer Clinic and HMC should have known that he was at least contemplating pursuing an FCA case.). In fact, Defendants' actions in trying to block Dr. Mehlman from airing his grievances in public and testifying to Durrani's misconduct indicates that, not only they should have known that Dr. Mehlman was contemplating a FCA claim, but that they knew.

*Giurca v. Orange Reg'l Med. Ctr.*, 2019 U.S. Dist. LEXIS 209198, at **6-7 (S.D.N.Y. Dec. 2019), an unreported case from a jurisdiction outside the Sixth Circuit, is persuasive authority at best. It is also inapposite, In *Orange Reg'l Med. Ctr,* the FCA claim was dismissed because the complaint did not "allege that defendants engaged in billing practices that defrauded the government." *Id.* This is not the case here.

Dr. Mehlman has alleged facts sufficient to support all the elements of a § 3730(h) claim, therefore, Defendants' motion to dismiss the FCA claim should be denied.

### (ii)     Dr. Mehlman has stated a claim for wrongful disciplinary action under Ohio law

Defendants claim that Dr. Mehlman's wrongful disciplinary action under Ohio law must fail because (i) he is not an at-will employee and (ii) he has not cited any clear public policy that has been violated. Defendants are misguided as to both reasons.

First, case law requires that in order to state a claim for *wrongful discharge* in violation of Ohio public policy, an employee must be an at-will employee. *Greeley v. Miami Valley Maintenance Contrs., Inc*., 49 Ohio St.3d 228, 551 N.E.2d 981 (1990). However, here, Dr. Mehlman's claim is not one for wrongful discharge but wrongful disciplinary action – the retaliatory suspension of his privileges. As underlined by Dr. Ruddy in the September 16, 2020 letter notifying Dr. Mehlman of his suspension and as highlighted by Defendants in their Motion Dr. Mehlman' suspension of

privileges arises out of the CCHMC medical staff bylaws, not his contract. Dkt. No.8, PageID #
198.

Dr. Mehlman has clearly established which public policies have been violated. To wit. He has
alleged that (i) Ohio law imposes a duty to be truthful under oath. O.R.C. §§ 2921.11 & 2921.13;
(ii) Ohio has a clear public policy that favors reporting by employees of potential violations of the
State's laws, and or workplace situations or occurrences which are likely to cause a hazard to
public health or safety, or which may be a felony under Ohio law as reflected in Ohio's statutes,
regulations, and common law, including but not limited to, Ohio's Whistleblower statute, O.R.C.
§ 4113.52; and (iii) Defendants' retaliation against Dr. Mehlman for consulting and retaining
counsel violates the clear public policy of Ohio which favors the right of an employee to consult
with an attorney regarding his legal rights and Dr. Mehlman's right and duty to testify truthfully,
albeit unfavorably, regarding suspected wrongful conduct by his employer. Dkt. No. 1, PageID
## 22-25, ¶¶ 101-108; 11-116; 120-122.[5] Further, the Complaint establishes that Dr. Mehlman
complied with the provisions of the Ohio Whistleblower statute by providing oral and then written
notification to Defendants of their and Durrani's acts jeopardizing the health, safety, and welfare
of patients and defrauding the government." *Id*. at ¶¶40-44; 45-47; 50; 84. 18. The very statements
alleged by Dr. Mehlman in the Complaint were sufficient to indict Durrani on Medicare and
Medicaid fraud and performing unnecessary surgeries. They should also satisfy FRCP 8(a)(2)
which requires only "a short and plain statement of the claim showing that the pleader is entitled
to relief," in order to "give the defendant fair notice of what the plaintiff's claim is and the grounds
upon which it rests." *Georgandellis v. Holzer Clinic, Inc*., No. 2:08-CV-626, 2009 WL 1585772,
at *13 (S.D. Ohio June 5, 2009) citing *Swierkiewicz v. Sorema N.A*., 534 U.S. 506, 507, 122 S.Ct.

---

[5] Dr. Mehlman as a medical professional also had a duty to report child abuse or neglect. See ORC § 2151.421.

16

992, 152 L.Ed.2d 1 (2002). At that stage of the proceedings, Dr. Mehlman has pleaded enough fact to show that he is entitled to relief and to enable him to proceed to discovery.

**(iii)    Dr. Mehlman has stated a claim for breach of contract**

According to Defendants, Dr. Mehlman's contract claim should be dismissed because he allegedly fails to specify which duties he was prevented to exercise under Section 5 of the Agreement and because suspension of Dr. Mehlman's privileges arises not from the Agreement but from the medical staff bylaws. Dkt. No. 8, PageID # 15. Defendants misconstrue Dr. Mehlman's claim.

As noted above,  FRCP 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. Under that rule, Dr. Mehlman does not need to detail each duty set forth in Section 5 of the Agreement. It is sufficient for him to point to Section 5 which, among other things, requires him devote his time to the practice of medicine and the care of patients which he was unable to do as a result of Defendants' action  to give them fair notice. Dkt. No. 1, PageID # 25, ¶125. Further, Defendants' argument that they did not breach Section 18(j) of the Agreement because the Agreement only addresses termination not suspension of privileges and behavioral concerns is a red herring. The Agreement, like all contracts, creates rights and duties for both parties. Here, it provides that, in exchange for being a full-time employee, Dr. Mehlman is to "devote his full time and attention to the practice of medicine' at CCHMC. Dkt. No. 1, PageID# 4, ¶10. At least one aspect of the current dispute between Dr. Mehlman and CCHMC is whether he can comply with this provision. It clearly arises from the Agreement. Dr. Mehlman has stated a claim for breach of contract.

**(iv)    Dr. Mehlman has stated a claim for tortious interference with business relationship under Ohio law**

17

Defendants also seek dismissal of Dr. Mehlman's tortious interference with business relationship because (i) he has not demonstrated malice on the part of Defendants; (ii) has not alleged the loss of actual patients and (iii) has no damages as result of their actions. Dkt. No. 8, PageID # 199-200.  Dr. Mehlman's allegations demonstrate all three.

Dr. Mehlman does not challenge Defendants' statement of the law. He challenges their interpretation of the facts. Actual malice in a tortious interference claim is not ill-will, spite, or hatred; rather, it denotes an unjustified or improper interference with the business relationship. *Chandler & Assoc., Inc. v. Am.'s Healthcare All., Inc*., 125 Ohio App. 3d 572, 583, 709 N.E.2d 190, 197 (1997)

The Complaint is replete with allegations regarding Defendants' improper and unjustified interference with Dr. Mehlman's business. It draws a parallel between Defendants' interference with Dr. Mehlman's practice and Dr. Mehlman's willingness to speak in public and in legal proceedings about the Durrani situation. As the latter increases, so does Defendants' interference to culminate in the unjustified and improper suspension of his privileges. Dtk. No. 1, PageID ##15-19, ¶¶ 65,66,67,69,70, 72,73,75-77, 82,83,87. All the actions taken by Defendants in retaliation for Dr. Mehlman speaking out about the Durrani situation, and his suspension of privileges in particular, impacted him financially. Dr. Mehlman has alleged that he was unable to perform surgeries and accept referrals during his unwarranted and retaliatory suspension. *Id*. at ¶89.

Further, discovery will show that his suspension was associated with at least *four* significant surgery cancellations - two spine surgeries and two fracture surgeries. Further, since a significant portion of his party of his pediatric practice is trauma related, he lost an undetermined number of trauma patients during the period of his suspension. Finally, during his two-week suspension, Dr. Mehlman would have consulted with an estimated 180 to 200 out- patients who had to be

18

rescheduled or in the case of fresh / new fractures shifted to other partners. Those new fracture patients alone could account for $20, 000 to $30,000 in lost revenue to him.

The posture of the cases Defendants cite is vastly different from the posture of this case. These cases are decisions on summary judgment cases where the parties have had an opportunity to present actual evidence in support of their allegations. *See e.g.*, *Zarwasch-Weiss v. SKF Economos USA, Inc.*, No. 1:10-CV-01327, 2012 WL 194515, at \*\*12,13 (N.D. Ohio Jan. 12, 2012); *WLB Radiology, LLC v. Mercy Health N., LLC,* 2016-Ohio-5276, ¶ 40, 69 N.E.3d 1032, ¶ 9 (6th Dist.); and *Sickle–Santanello v. Ohiohealth Corp*., Franklin C.P. No. 10 CV 17393, 2013 Ohio Misc. LEXIS 9348, \*19 (May 31, 2013).[6] This is not the case here.

The Complaint's allegations are sufficient to comply with FRCP 8(a)(2) and put Defendants on notice of Dr. Mehlman's claim. *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (FRCP 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."). In addition, malice is a question of fact that cannot be determined on a motion to dismiss. Accordingly, Defendants' Motion should be denied.

**(v)    Dr. Mehlman has stated a claim for intentional infliction of emotional distress**

To state a claim for intentional infliction of emotional distress in Ohio, a plaintiff must allege that (1) defendants intended to cause emotional distress, or knew or should have known that their actions would result in plaintiff's serious emotional distress, (2) defendants' conduct was extreme and outrageous, (3) defendants' actions proximately caused plaintiff's emotional injury, and (4)

---

[6] *See e.g.*, *Zarwasch-Weiss v. SKF Economos USA, Inc.*, No. 1:10-CV-01327, 2012 WL 194515, at \*\*12,13 (N.D. Ohio Jan. 12, 2012); *WLB Radiology, LLC v. Mercy Health N., LLC,* 2016-Ohio-5276, ¶ 40, 69 N.E.3d 1032, ¶ 9 (6th Dist.); and *Sickle–Santanello v. Ohiohealth Corp*., Franklin C.P. No. 10 CV 17393, 2013 Ohio Misc. LEXIS 9348, \*19 (May 31, 2013).

plaintiff suffered serious emotional anguish. *Hanly v. Riverside Methodist Hosps.*, 78 Ohio App.3d 73, 603 N.E.2d 1126, 1132 (1991) (citing *Pyle v. Pyle*, 11 Ohio App.3d 31, 463 N.E.2d 98, 103 (1983)).

Dr. Mehlman has satisfied his burden. The *raison d'etre* of the Complaint is precisely the outrageous actions undertaken by Defendants as retaliation for Dr. Mehlman's speaking out about the extreme dangers posed by Durrani and Defendants' willful blindness to these actions as detailed in the above sections. It is not a stretch to say that the "recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!" *Miller v. Currie*, 50 F.3d 373, 378 (6th Cir. 1995). Defendants' labeling of Dr. Mehlman's conduct as disruptive is nothing but a brazen attempt to deflect attention from their own outrageous conduct. This is not a case where someone's one's feelings were merely hurt. *Miller v. Currie*, 50 F.3d 373, 378 (6th Cir. 1995) (internal citations omitted). Over the course of numerous years, Dr. Mehlman has been harassed, punished and ultimately prevented from practicing medicine for doing what's right and abiding by the oath he had taken. It is more than plausible that, Dr. Mehlman has suffered severe emotional distress as a result of Defendants' actions. Dkt. No. 1, PageID #20, 27, ¶¶90, 140-141. Dr. Mehlman's intentional infliction of emotional distress claim should not be dismissed.

### (vi)     Dr. Mehlman has stated a claim for negligent infliction of emotional distress

Ohio does not recognize negligent infliction of emotional distress as a cause of action *where the basis is the termination of one's employment*. *Bush v. Am. Honda Motor Co.*, 227 F. Supp. 2d 780, 800 (S.D. Ohio 2002) citing *Dunlap v. General Motors Corp.,* 221 F.3d 1334, 2000 WL 799788 (6th Cir. 2000) (emphasis added). Further to recover under such a claim, a plaintiff must show a contemporaneous physical injury or the  emotional distress must be so severe and

debilitating that a reasonable person, normally constituted would be unable to cope with the mental distress engendered by the circumstances of the case. *Paugh v. Hanks*, 6 OhioSt.3d 72, 72, 451 N.E.2d 759 (1983). As explained at length above, the basis for Dr. Mehlman's claim here is not termination of his employment, but merely that Defendants' retaliation actions were so outrageous that he suffered severe emotional distress. These are questions of facts for a jury to determine. Accordingly, dismissal of this claim is not proper at that stage.

## IV. CONCLUSION

Because Dr. Mehlman's claims are not barred, the Court should deny Defendants' Motion to Dismiss.

Respectfully submitted,

**STATMAN, HARRIS & EYRICH, LLC**

**/s/ Alan J. Statman**
Alan J. Statman (0012045)
Sylvie Derrien (0072579)
Executive Building
35 E. 7th Street, Suite 315
Cincinnati, Ohio 45202
Phone: (513) 621-2666
Facsimile: (513) 621-4896
E-Mail: ajstatman@statmanharris.com
         sderrien@statmanharris.com
*Attorneys for Plaintiff, Dr. Charles T. Mehlman*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing has been filed electronically on December 14, 2020.

Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

Parties may access this filing through the Court system.


**/s/ Alan J. Statman**
Alan J. Statman (0012045)