## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

CHARLES T. MEHLMAN,                         Case No. 1:20-cv-813
     Plaintiff,                          Dlott, J.
                                            Litkovitz, M.J.
    vs.

CINCINNATI CHILDREN'S HOSPITAL              **ORDER AND REPORT**
MEDICAL CENTER, et al.,                     **AND RECOMMENDATION**
     Defendants.

     This matter is before the Court on the motion to dismiss (Doc. 8) filed by defendants Cincinnati Children's Hospital Medical Center (CCHMC), Richard M. Ruddy,[1] M.D., and Daniel von Allmen, M.D. (collectively, defendants). Plaintiff Charles T. Mehlman filed a response (Doc. 13) to which defendants have replied (Doc. 14). Both parties have requested oral argument. Pursuant to S.D. Ohio Civ. R. 7.1, the Court finds that oral argument is not "essential to the fair resolution" of this case and denies the requests for oral argument. The Court recommends that defendants' motion be granted in part and denied in part.

## I.    Background[2]

     Plaintiff is a pediatric orthopedic surgeon who has been licensed to practice medicine in Ohio since 1990 and employed by CCHMC since 1996. CCHMC and plaintiff entered into an employment agreement on March 1, 2002. (*See* Doc. 1-2). Since 2015, defendant Richard Ruddy, M.D., has occupied several administrative positions at CCHMC, including chairman of the Professional Practice Evaluations Committee (PPEC), president of the Medical Executive Committee (MEC), and clinical director of CCHMC Liberty Campus (a satellite CCHMC

---

[1] The caption of plaintiff's complaint and docket sheet reflect the spelling of his surname as "Rudy," but the parties uniformly use this spelling in the filings now before the Court.
[2] The factual background is derived from plaintiff's complaint (Doc. 1) and attached employment contract (Doc. 1-2).

location).  Since 2012, defendant Daniel von Allmen, M.D., has occupied several administrative positions at CCHMC, including member of the PPEC, member of the MEC, and Surgeon-In-Chief.

Plaintiff's tenure with CCHMC coincided with that of Abubakar Atiq Durrani (Durrani). Durrani completed a fellowship at and was later employed by CCHMC in the department of pediatric orthopedic surgery until his resignation in 2008.  During that time, Durrani was a top biller and generated significant revenue for CCHMC.  Eventually, however, hundreds of medical malpractice lawsuits were filed against Durrani, many of which also named CCHMC as a defendant.  Durrani was also criminally investigated and indicted.  In December 2013, Durrani absconded to Pakistan.

Beginning in 2006, plaintiff grew concerned about Durrani's medical treatment and care, based in part on two patients who experienced unusual spinal cord complications that required follow-up surgery.  Plaintiff began reporting his concerns to CCHMC administrators and other employees.  Eventually, plaintiff brought his concerns to CCHMC peer review meetings and the Division Director for Orthopedics.  His concerns did not lead to action regarding Durrani.  Aside from Durrani, plaintiff also raised quality of care, negative customer service reports, and deficient surgery support issues with CCHMC executives.

A patient first filed a lawsuit against Durrani and CCHMC in 2008.  In 2009 and 2011, two other Durrani patients filed lawsuits and each sought plaintiff's deposition in October 2011 and November 2012.  In the midst of these lawsuits, in October 2012, the PPEC raised concerns about plaintiff's behavior relative to operating room personnel—plaintiff's first ever issue with the PPEC during his tenure with CCHMC.  As a result, plaintiff agreed to undergo counseling with a psychologist.

2

In May 2013, federal agents interviewed plaintiff relative to their criminal investigation of Durrani, culminating in Durrani's August 9, 2013 indictment. In the days and weeks following the indictment, CCHMC administrators and PPEC members met with plaintiff regarding what they characterized as "abusive conversations, demeaning comments, and insulting comments" with and to surgery staff in the orthopedic and urology departments. (Doc. 1, PAGEID 14 at ¶ 60).

Between late 2013 and 2015, many former Durrani patients filed lawsuits (more than 80 of which also naming CCHMC as a defendant) and requested to depose plaintiff through CCHMC's counsel. CCHMC's counsel did not notify plaintiff of these requests. During this time period, plaintiff's PPEC reprimands increased significantly.

On February 22, 2018, attorney Frederick Johnson moved to compel plaintiff's deposition in "all [CCHMC] cases on the issue of [CCHMC's] liability." (*Id.*, PAGEID 16 at ¶ 71). Around the same time, plaintiff met with CCHMC's counsel and secured his own counsel. On March 23, 2018, the PPEC placed plaintiff on a performance improvement plan, warning that plaintiff would be referred to the MEC absent his cooperation. Believing this discipline to be in retaliation for his voiced concerns regarding Durrani and subsequent cooperation with the Durrani civil litigation and criminal investigation, plaintiff notified CCHMC of the same through counsel on March 28, 2018.

On June 15, 2018, plaintiff testified by deposition under subpoena against CCHMC. Less than two weeks later, Dr. Ruddy notified plaintiff that CCHMC would extend plaintiff's full, unrestricted clinical privilege for only six months as opposed the prior norm of two years. On December 18, 2018, plaintiff testified under subpoena in another Durrani-related lawsuit naming CCHMC. On December 19, 2018, a jury awarded over two million dollars to the plaintiff in that

case.  On December 20, 2018, the PPEC met with plaintiff and instructed him to continue job

coaching and raised a new issue regarding a surgery consult (plaintiff allegedly disagreed in an

argumentative way with the treatment recommendation from the pediatric neurosurgery

department).

In September 2020, plaintiff raised concerns over patient safety—acknowledging in

retrospect that he "could have used more polite language."  (Doc. 1, PAGEID 19 at ¶ 84).  This

resulted in plaintiff agreeing to periodic counseling.  Notwithstanding the fact that this discipline

was already in place, on September 18, 2020,[3] CCHMC suspended plaintiff for two weeks.  This

suspension caused plaintiff to reschedule surgeries, left a permanent mark on plaintiff's record

with the State of Ohio Medical Board, and prevented plaintiff from accepting certain referrals.

Plaintiff filed this lawsuit on October 16, 2020, alleging claims of retaliation under the

False Claims Act (FCA), 31 U.S.C. § 3730(h) (Count I), wrongful disciplinary action in violation

of Ohio's public policy (Counts II-IV), breach of contract and the duty of fair dealing (Count V),

tortious interference with business relationship (Count VI), intentional infliction of emotional

distress (Count VII), and negligent infliction of emotional distress (Count VIII).

## II.     Standard of Review

In deciding a motion to dismiss under Rule 12(b)(6), the Court must accept all factual

allegations as true and make reasonable inferences in favor of the non-moving party.  *Keys v.

Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012) (citing *Harbin-Bey v. Rutter*, 420 F.3d 571, 575

(6th Cir. 2005)).  Only "a short and plain statement of the claim showing that the pleader is

entitled to relief" is required.  *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).  "[T]he statement need only

---

[3] The complaint and plaintiff's response reference both September 16 and September 18 as the date of this action. (*See* Doc. 1 at PAGEID 7, 9, 19, 25; Doc. 13 at PAGEID 260, 268).  The Court refers to the September 18 date because it is more frequently referenced.

give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Id.*

(internal quotation marks omitted) (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)).

Although the plaintiff need not plead specific facts, the "[f]actual allegations must be enough to

raise a right to relief above the speculative level" and to "state a claim to relief that is plausible

on its face." *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). "A

plaintiff must 'plead[] factual content that allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009)).

### III. Analysis

#### A. Immunity

Defendants argue that, as a threshold matter, they are immune from plaintiff's claims

under both federal and Ohio laws regarding professional peer review. Relatedly, they argue that

plaintiff's allegations admit that he was disciplined in the context of peer review (i.e., the PPEC

and MEC committees). Plaintiff argues in response that federal law sets forth only immunity

from damages, not suit. With respect to Ohio law, plaintiff argues that his complaint alleges

actual malice that overcomes any presumption of immunity.

##### 1. *Health Care Quality Improvement Act (HCQIA), 42 U.S.C. § 11101 et seq.*

The HCQIA was enacted to improve a perceived declining quality of medical care

through effective professional peer review. *Reyes v. Wilson Mem'l Hosp.*, 102 F. Supp. 2d 798,

808 (S.D. Ohio 1998). Under the statute, persons participating in a professional review action[4]

---

[4] This includes: "(A) the professional review body, (B) any person acting as a member or staff to the body,
(C) any person under a contract or other formal agreement with the body, and (D) any person who participates with
or assists the body with respect to the action. . . ." 42 U.S.C. § 11111(a)(1).

"shall not be liable in damages under any law of the United States or of any State (or political

subdivision thereof) with respect to the action" *if the action is taken*:

> (1) in the reasonable belief that the action was in the furtherance of quality health care,
> (2) after a reasonable effort to obtain the facts of the matter,
> (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and
> (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).
>
> A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section 11111(a) of this title unless the presumption is rebutted by a preponderance of the evidence.

*Id.* at §§ 11111(a), 11112(a).[5]  In effect, "*plaintiff* bears the burden of proving that a peer review

process was *not* reasonable."  *Moore v. Rubin*, No. 2001-T-0150, 2004 WL 2803237, at *4 (Ohio

Ct. App. 2004) (quoting *Bryan v. James E. Holmes Reg'l Med. Ctr.*, 33 F.3d 1318, 1333 (11th

Cir. 1994)).

The HCQIA does not provide immunity from suit.  "Instead, § 11111(a)(1) provides that

if a professional review action meets [HCQIA's] standards, the peer review participants 'shall

not be *liable in damages*.'"  *Manion v. Evans*, 986 F.2d 1036, 1039 (6th Cir. 1993) (quoting 42

U.S.C. § 11111(a)(1)).  Plaintiff's complaint contains allegations that undermine the presumption

that defendants' actions in connection with professional review met the standards of 42 U.S.C. §

11112(a)—in particular, that they were taken "in the reasonable belief" that they were "in the

furtherance of quality health care" and that they were taken "after a reasonable effort to obtain

the facts of the matter. . . ."  *Id.*  (*See, e.g.,* Doc. 1, PAGEID 15-16 at ¶ 69, PAGEID 16 at ¶¶ 73-

74; PAGEID 19 at ¶¶ 83, 85).   Construed in plaintiff's favor in the posture of a motion to

---

[5] As it relates to both this statute and Ohio's corollary, plaintiff does not appear to dispute that the challenged actions were professional review taken by professional review entities as contemplated by these statutes.

dismiss, defendants are not entitled to a blanket dismissal of claims on the basis of the HCQIA. Based on the construction of 42 U.S.C. § 11112(a), plaintiff may discover evidence to rebut the presumption that PPEC's process was reasonable in this case. *Reyes*, 102 F. Supp. 2d at 810 ("Because questions of law do not turn upon the satisfaction of evidentiary burdens, it is clear that the reasonableness or adequacy of a particular review action is a question of fact, to be resolved by the trier of fact.").

Defendants argue that subjective bias and bad faith in the peer review process are irrelevant, citing *Sugarbaker v. SSM Health Care*, 190 F.3d 905 (8th Cir. 1999); *Meyers v. Logan Mem'l Hosp.*, 82 F. Supp. 2d 707 (W.D. Ky. 2000), *aff'd sub nom. Meyers v. Columbia/HCA Healthcare Corp.*, 341 F.3d 461 (6th Cir. 2003); and *Emlich v. OhioHealth Corp.*, No. 2:14-cv-1697, 2016 WL 7406536, at *9 (S.D. Ohio Dec. 22, 2016), and are similar to the retaliatory actions alleged by plaintiff. Again, each of the cases cited by defendants was decided in a summary judgment posture and not on a motion to dismiss as in the instant case. *See Sugarbaker*, 190 F.3d at 914 (affirming grant of summary judgment where plaintiff relied on inferences of conspiracy but no "hard evidence" to create a genuine issue of material fact to rebut the HCQIA's presumption in favor of peer review committees); *Emlich*, 2016 WL 7406536, at *10-13 (summary judgment granted against plaintiff physician where the physician presented *no evidence* that peer review action was pretextual). Defendants also cite *Babb v. Ctr. Cmty. Hosp.*, 47 A.3d 1214, 1226 (Pa. Super. Ct. 2012) to support their argument that subjective motivations, such as "purported bias, pretextual motives, and bad faith" are "irrelevant to the objective test of whether the professional review action was reasonable." *Id.* The Sixth Circuit, too, has acknowledged that the "reasonable belief" standard set forth in 42 U.S.C. § 11112(a)(1) is an objective standard. *See Meyers*, 341 F.3d at 468. The Court nevertheless finds that plaintiff's

allegations, construed on the whole and in his favor, plausibly show that defendants' actions were not "undertaken in the reasonable belief that quality health care was being furthered." *Id.* (citation omitted).

The Court also finds that plaintiff's complaint is distinguishable from the complaints in the cases cited by defendants in which courts have determined immunity under the HCQIA on a motion to dismiss. *See Sobel v. United States*, 571 F. Supp. 2d 1222, 1229 (D. Kan. 2008) ("[T]he amended complaint fails to state *any facts* alleging that the defendant did not comply with [42 U.S.C. § 11112(a)'s] procedural due process requirements. . . .") (emphasis added); *Straznicky v. Desert Springs Hosp.*, 642 F. Supp. 2d 1238, 1246 (D. Nev. 2009) ("[T]hough [the plaintiff] argues he alleged that the defendants did not provide him with due process, *he does not address any of the four § 11112(a) requirements* pursuant to which this court must review the propriety of a professional review action.") (emphasis added).  Here, plaintiff's complaint is not so bare.  (*See, e.g.,* Doc. 1, PAGEID 15-16 at ¶ 69; PAGEID 16 at ¶¶ 73-74; PAGEID 19 at ¶¶ 83, 85).

Finally, defendants argue that the distinction between immunity from damages and immunity from suit is one "without a difference[,]" because plaintiff seeks only damages in this lawsuit.  (Doc. 14 at PAGEID 277 n.1).  The HCQIA, however, does not provide blanket immunity from damages; it provides "qualified immunity from damages" *only if* the 42 U.S.C. § 11112(a) presumption is *not* rebutted by plaintiff.  *Meyers*, 341 F.3d at 467.  Given this construction and the procedural posture of this case, plaintiff still has an opportunity to rebut this presumption and become entitled to damages.  Based on the foregoing, the Court finds that plaintiff's claims are not barred by the HCQIA at this stage of the litigation.

2. *Ohio Rev. Code § 2305.251*

Under Ohio law:

(A) No health care entity shall be liable in damages to any person for any acts, omissions, decisions, or other conduct within the scope of the functions of a peer review committee of the health care entity. No individual who is a member of or works for or on behalf of a peer review committee of a health care entity shall be liable in damages to any person for any acts, omissions, decisions, or other conduct within the scope of the functions of the peer review committee.

Ohio Rev. Code § 2305.251(A).

Unlike the HCQIA, Ohio's statute does not give plaintiff the explicit option to rebut a presumption of reasonableness. The immunity set forth in § 2305.251(A), however, "may be defeated by a showing of actual malice." *Vistein v. Am. Registry of Radiologic Technologists*, 509 F. Supp. 2d 666, 677 (N.D. Ohio 2007), *aff'd in part, rev'd in part on other grounds*, 342 F. App'x 113 (6th Cir. 2009) (citing *Jacobs v. Frank*, 573 N.E.2d 609 (Ohio 1991) and *Wall v. Ohio Permanente Med. Group*, 695 N.E.2d 1233 (Ohio Ct. App. 1997)). In this context, actual malice "requires proof that defendants made statements in connection with the peer review process with knowledge they were false or with reckless disregard for whether they were true or false." *Wall, Inc.*, 695 N.E.2d at 1241 (citing *Jacobs*, 573 N.E.2d at 612-14) (footnote omitted).

Defendants argue that plaintiff alleged only that their peer review actions were pretextual, which does not rise to the level of actual malice. Plaintiff argues that his allegations of pretext necessarily involve defendants' untruthfulness. Both parties rely on *Wall* to support their argument. In *Wall*, the plaintiff physician sued a professional corporation, other physicians, and a hospital following his termination. *Id.* at 1236. The court of appeals affirmed summary judgment for the defendants, in part, because the plaintiff failed to meet his evidentiary burden to show malice. *Id.* at 1243. The court held that the "[plaintiff] did not prove *by clear and convincing evidence* that they acted with actual malice. . . . Contrary to [the plaintiff's] claims,

9

the record shows that the actions of [the defendants] were in good faith, supported by substantial evidence, and in accordance with fair procedures." *Id.* (citation omitted) (emphasis added).

The Court declines to decide a matter of an evidentiary burden as a matter of law without a factual record. *Cf. Reyes*, 102 F. Supp. 2d at 810. Unlike *Walls*, this matter is before the Court on a motion to dismiss and not a motion for summary judgment upon a full factual record. Plaintiff alleges he was suspended notwithstanding the fact that separate discipline had already been imposed in the form of compulsory counseling for the allegedly impolite conversation regarding patient safety. (*See* Doc. 1, PAGEID 19 at ¶¶ 84-85). Construed in his favor, the plausible inference to draw from these and the other allegations in the complaint is that the stated reasons for plaintiff's suspension were false and that, in fact, the suspension represented retaliation for plaintiff's cooperation in the Durrani civil and criminal legal proceedings. The Court finds that, at this stage of the proceeding, plaintiff's complaint adequately alleges actual malice such that his claims should not be dismissed on the basis of Ohio Rev. Code § 2305.251(A).

B. <u>Retaliation under the FCA</u>

The FCA, 31 U.S.C. § 3729 *et seq*., imposes civil liability on an individual or entity that defrauds the federal government. *U.S. v. Brookdale Senior Living Communities, Inc.*, 892 F.3d 822, 826 (6th Cir. 2018), *cert. denied sub nom. Brookdale Senior Living Communities, Inc. v. U.S. ex rel. Prather*, 139 S. Ct. 1323 (2019) (citing *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, _ U.S. _, 136 S. Ct. 1989, 1996 (2016)). "The FCA protects 'whistleblowers' who pursue or investigate or otherwise contribute to a qui tam action[6], exposing fraud against the

---

[6] A civil action under the FCA may be brought by the Attorney General or a private person. *See* 31 U.S.C. §§ 3730(a)-(b). "A private enforcement action under the FCA is called a qui tam action. . . ." *U.S. ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 932 (2009). "'Qui tam' is an abbreviation for the Latin phrase 'qui tam pro domino rege quam pro si ipso in hae parte seqintur,' which means 'who sues on behalf of the King as well as for himself.'"

United States government." *McKenzie v. BellSouth Telecommunications, Inc.*, 219 F.3d 508, 513–14 (6th Cir. 2000) (citing 31 U.S.C. §§ 3729–3730).  Under the FCA's retaliation provision:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1).

Defendants argue that, even if they are not immune from suit, plaintiff's FCA retaliation claim fails as a matter of law.  First, defendants argue that the claim must fail as it pertains to defendants Dr. Ruddy and Dr. von Allmen, who are not "employers" under the statute.  *See Roberto v. Kent State Univ.*, No. 5:16-cv-1305, 2017 WL 1155563, at *2-3 (N.D. Ohio Mar. 28, 2017) (collecting cases) ("This Court joins the growing majority of courts and concludes that the anti-retaliation provision of the [FCA] does not permit a cause of action against individual supervisors.").  *See also Georgandellis v. Holzer Clinic, Inc.*, No. 2:08-cv-626, 2009 WL 1585772, at *7 (S.D. Ohio June 5, 2009) (granting motion to dismiss FCA retaliation claim against the individual defendants because they were never the plaintiff's employer).  Plaintiff does not respond to this argument or authority.  The Court finds that the FCA claim asserted against Drs. Ruddy and von Allmen should be dismissed.

As it relates to CCHMC, defendants argue that plaintiff's complaint does not allege any of the prima facie elements of an FCA retaliation claim: that he was engaged in protected conduct, that CCHMC knew that he was engaged in protected conduct, and that the protected

---

*United States v. Health Possibilities, P.S.C.*, 207 F.3d 335, 337 (6th Cir. 2000) (quoting *United States ex rel. Branhan v. Mercy Health Sys. of Sw. Ohio*, No. 98-3127, 1999 WL 618018, at *4 n.5 (6th Cir. 1999) (unpublished opinion)).

conduct resulted in retaliatory action. Plaintiff responds that a broad reading of "protected activity" supports his claim, and the complaint alleges that CCHMC's retaliation against plaintiff was tied to his complaints about both Durrani and other issues that "amount to health care fraud, waste, and abuse and violations of patient care standards that are material to the payment of government dollars." (Doc. 13 at PAGEID 267).

To state a claim under the FCA's anti-retaliation provision, a whistleblower plaintiff must allege facts showing: 1) he was engaged in a protected activity; 2) his employer knew about the protected activity; and 3) the employer discharged or otherwise discriminated against the employee as a result of his protected activity. *McKenzie*, 219 F.3d at 514 (citations omitted). Retaliation claims do not depend on the success (or even existence) of an underlying qui tam action. *Id.* at 516 (citations omitted). A plaintiff's protected activity under this code section must, however, have "some nexus to the FCA to satisfy the 'in furtherance of' prong of an FCA claim, by reasonably leading to a viable FCA action." *Id.* at 517 (citations omitted). Plaintiff need not use "formal words of 'illegality' or 'fraud,'" but his protected activity must relate to "exposing fraud" or "involvement with a false claims disclosure." *Id.* at 516 (quoting *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951-52 (5th Cir. 1994) and S. REP. NO. 99-345, at 34 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5299).

Plaintiff argues the complaint alleges facts showing protected activity under the FCA. Plaintiff relies on *Georgandellis,* 2009 WL 1585772, in which the plaintiff physician alleged FCA retaliation related to his complaints about a fellow physician. In particular, the plaintiff in *Georgandellis* alleged that he:

> told members of the Clinic Board on several occasions about the "fraud" perpetrated on Medicare for the services rendered by [a fellow physician]. . . . [The plaintiff] also raised the issues of Medicare fraud . . . at a department of medicine meeting of the Medical Center . . . as well as the . . . quarterly medical

> staff meeting. . . . He "also raised the possibility of Medicare fraud with respect
> to billings submitted by the Clinic . . . for work that was never performed. . . .
> Finally . . ., he advised Defendants "that billing for [a fellow physician's]
> uncredentialed work contravened the False Claims Act and constituted Medicare
> fraud."

*Id.* at *10 (quoting the plaintiff's complaint). The court found that these allegations

demonstrated protected activity under the FCA's retaliation provision. *Id.* at *11.

Defendants argue that this case is more analogous to *Giurca v. Orange Reg'l Med. Ctr.*,

No. 19 Civ. 1096, 2019 WL 6529285, at *2 (S.D.N.Y. Dec. 4, 2019). In *Giurca*, the plaintiff

psychiatrist alleged FCA retaliation related to his complaints regarding a fellow physician. *Id.* at

*1. The plaintiff alleged "that [fellow physician's] bare and inadequate patient notations were

insufficient 'to seek reimbursement for services not rendered or worthless services' and 'lacked

the elements for proper coding and for seeking reimbursement.'" *Id.* at *2 (quoting the

plaintiff's complaint). The court noted, however, that "[the plaintiff] d[id] not allege that any

medical services related to those notations w[ere] billed (fraudulently or not) to Medicare,

Medicaid, or any other government-funded program." *Id.* Put differently, the plaintiff's alleged

protected activity did not amount to "complaint[s] directed at exposing fraud upon the

government" or "report[s] to anyone that defendants engaged in billing practices that defrauded

the government." *Id.* at *3 (citation omitted). Defendants also cite *Mikhaeil v. Walgreens Inc.*,

No. 13-14107, 2015 WL 778179 (E.D. Mich. Feb. 24, 2015), in which the court found a genuine

issue of material fact regarding protected activity where the plaintiff testified that she had told

her supervisor about a potential instance of Medicare fraud. *Id.* at *8. The *Mikhaeil* court

distinguished this from the plaintiff's "grumbling" about potential federal controlled substance

regulation violations, which did not constitute protected activity. *Id.* (citing *McKenzie*, 219 at

516-17).

13

Turning to the complaint at bar, plaintiff points to seven paragraphs that he alleges demonstrate his protected activity. (*See* Doc. 13 at PAGEID 267). Of those, only one appears to approach protected activity as opposed to the type of unprotected "grumbling" distinguished by the courts in *McKenzie* and *Mikhaeil*:

> 44. Although [plaintiff] brought the issue of unnecessary, risky and/or unapproved procedures to the attention of CCHMC executives and [d]efendants in particular, *they continued to submit claims to the Federal Government for reimbursement in violation of the fraud and abuse laws.*

(Doc. 1 at PAGEID 10-11) (emphasis added). This allegation is distinguishable from the multiple, specific allegations relating to fraudulent government billing referenced in *Georgandellis* leading that court to find that the plaintiff had engaged in protected activity. It does not bear a sufficient nexus to an FCA claim (even if only contemplated and never consummated) to state a retaliation claim under the FCA. While the complaint alleges that plaintiff repeatedly brought concerns about Durrani's practices and competency to CCHMC leadership, the complaint is devoid of any allegations showing that his concerns were connected to *exposing* fraud or false claims against the federal government. *See McKenzie*, 219 F.3d at 517 ("[R]epeated refusals to falsify repair records and numerous complaints to supervisors are not sufficiently connected to exposing fraud or false claims against the federal government."). The complaint fails to plausibly allege protected activity under the FCA. Count I of plaintiff's complaint should be dismissed as to all defendants.

C. Wrongful discipline in violation of Ohio's public policy

"In Ohio, absent an employment contract, an employee is an employee at will and may be terminated at any time for any lawful reason or for no reason at all." *Herrington v. DaimlerChrysler Corp.*, 262 F. Supp. 2d 861, 864 (N.D. Ohio 2003), *aff'd,* 125 F. App'x 23 (6th Cir. 2004) (citing *Mers v. Dispatch Printing Co.,* 483 N.E.2d 150, 153 (Ohio 1985)). However,

if an at-will employee "is discharged or disciplined in contravention of a clear public policy articulated in the Ohio or United States Constitution, federal or state statutes, administrative rules and regulations, or common law, a cause of action for wrongful discharge in violation of public policy may exist as an exception to the general rule." *Dohme v. Eurand Am., Inc.*, 956 N.E.2d 825, 829 (Ohio 2011) (citing *Painter v. Graley*, 639 N.E.2d 51 (Ohio 1994), paragraph three of the syllabus; *Greeley v. Miami Valley Maintenance Contrs., Inc*., 49 Ohio St.3d 228, 551 N.E.2d 981 (Ohio 1994), paragraph one of the syllabus).

Plaintiff alleges that his discipline violated Ohio's public policies of supporting truthful testimony in judicial and quasi-judicial proceedings (citing Ohio Rev. Code §§ 2921.11, 2921.13, and 4731.22) (Count II); reporting suspected risks to public health and safety (citing Ohio Rev. Code §§ 4113.52, 4731, 4731.22, 4731.224; Ohio Admin. Code §§ 4731-15, 4731-18) (Count III); and open access to courts, i.e., the freedom to consult with and retain an attorney (citing OHIO CONST., art. 1, § 16; Ohio common law; and the Supreme Court of Ohio's Rules of Professional Conduct) (Count IV).

Defendants argue that plaintiff is prohibited from bringing these claims because they are reserved for at-will employees and plaintiff's employment by CCHMC is governed by contract. Plaintiff argues in response that this prohibition is inapplicable because his claims relate to discipline and not termination, and the requirement for at-will employment applies only to wrongful discharge in violation of public policy claims.  (Doc. 13 at PAGEID 268, citing *Greeley*, 551 N.E.2d 981).  He also contends that his discipline arose from CCHMC's medical staff bylaws and not his employment agreement.  (Doc. 13 at PAGEID 268-69).

Plaintiff does not cite any authority for the distinction he draws between "discipline" and "termination," and Ohio cases in this context discuss wrongful termination and wrongful

15

discipline in violation of Ohio's public policy interchangeably. *See, e.g., Greeley*, 551 N.E.2d at 986 ("[W]e hold that public policy warrants an exception to the employment-at-will doctrine when an employee is *discharged or disciplined* for a reason which is prohibited by statute.") (emphasis added). *Accord Dohme,* 956 N.E.2d at 829.

Moreover, plaintiff is not an at-will employee but a contractual employee of CCHMC. (*See* employment agreement, Doc. 1-2). While plaintiff alleges his discipline arose under the CCHMC bylaws and not his employment agreement, the employment agreement incorporates the CCHMC bylaws. The section titled, "**Duties of Physician**" states: "**Professional Standards.** Physician shall comply with all legal and ethical standards relating to the practice of medicine, including . . . *all rules and regulations of any hospital, and hospital medical staff*, at which the Physician practices medicine, and *all policies, practices, rules and regulations* of the Medical Center. . . ." (Doc. 1-2, PAGEID 40 at § 5(iii)) (emphasis added). As the Supreme Court of Ohio emphasized following *Greeley*, "in order for an employee to bring a cause of action pursuant to *Greeley*, . . . that employee must have been an employee at will." *Haynes v. Zoological Soc. of Cincinnati*, 652 N.E.2d 948, 951 (Ohio 1995). In fact, plaintiff bears the burden "to plead and prove that he was an employee at will." *Kusens v. Pascal Co.*, 448 F.3d 349, 364 (6th Cir. 2006) (quoting *Strausbaugh v. Ohio Dep't of Transp.*, 782 N.E.2d 92, 100 (Ohio Ct. App. 2002)).

Plaintiff offers no clear reason to depart from the limitation of public policy claim to the at-will-employment context. Nor has plaintiff cited any case in which a contractual employee has been permitted to bring a public policy claim alleging wrongful termination or discipline. The Court's own research has revealed that only cases concerning workers compensation present

16

an exception.[7]  *See, e.g., Coolidge v. Riverdale Loc. Sch. Dist.*, 797 N.E.2d 61, 65 (Ohio 2003)

(holding that terminating a teacher's contract could raise a public policy claim based on the

Workers' Compensation Act).  Because plaintiff has failed to plead that he is an at-will

employee, his complaint fails to state *Greeley* public policy claims for relief.  Counts II-IV of

plaintiff's complaint should be dismissed.

    D.  <u>Breach of contract and the duty of fair dealing</u>

    Plaintiff alleges that CCHMC breached the employment agreement at § 5 ("**Duties of**

**Physician**") and § 18(j) ("**Resolution of Disputes**").  (Doc. 1-2 at PAGEID 39-40, 47).

Defendants argue that plaintiff's general reference to § 5 and conclusory allegations related

thereto are insufficient to state a plausible breach of contract claim.  They also argue that

plaintiff's reference to a breach of the employment agreement at § 18(j) is inapposite because

that section encompasses only disputes "arising out of or relating to th[e] [employment

agreement]."  (*Id.* at PAGEID 47).  Defendants allege that plaintiff's PPEC review and discipline

occurred under the CCHMC medical staff bylaws and not the employment agreement.  As the

employment agreement provides procedures for termination of plaintiff's employment, any

alleged breach of § 18(j) is irrelevant because plaintiff's employment was never terminated.

    Plaintiff responds that his complaint is sufficiently specific in that it alleges that CCHMC

did not allow plaintiff to perform his duties under § 5 of the employment agreement, which

includes that he "devote his time to the practice of medicine and the care of patients. . . ."  (Doc.

---

[7] An employment contract also does not preclude a *Greeley* claim if it contains an at-will provision. *See, e.g., Hicks v. Bryan Med. Grp., Inc.*, 287 F. Supp. 2d 795, 808 (N.D. Ohio 2003) (citing *Nw. Fin. Agency, Inc. v. Transamerica Occidental Life Ins. Co.*, 773 F. Supp. 75, 79 (S.D. Ohio 1991)) (holding that a no-cause termination contract provision made the plaintiff an at-will employee).  The Court located one intermediate appellate case in Ohio in which the court considered a *Greeley* claim by a physician under an employment contract. *See Mitchell v. Mid-Ohio Emergency Servs., L.L.C.*, No. 03AP-981, 2004 WL 2803419, *1 (Ohio Ct. App. Sept. 30, 2004).  For purposes of its analysis, however, the court seems to have assumed that the plaintiff was an at-will employee and does not discuss the effect of his contract. *See id.* at *5.

13 at PAGEID 270). (*See also* Doc. 1, PAGEID 20 at ¶ 89 ("As a result of the 14-day suspension, [plaintiff] has been unable to perform surgeries and cannot accept referrals to him from other physicians of patients who require the specialty services [plaintiff] is qualified to perform."); PAGEID 25 at ¶ 125 ("Defendants breached [plaintiff's] Employment Agreement by preventing him from exercising his duties pursuant to Section 5 of the Employment Agreement."); Doc. 1-2, PAGEID 39 at §§ 5(a)-(b)) ("Physician shall devote substantially Physician's entire professional time and attention to the practice of medicine" and "shall provide medically necessary services for patients in accordance with schedules established by [CCHMC]. . . .")).

A breach of contract under Ohio law requires "the existence of a contract, the failure without legal excuse of the other party to perform when performance is due, and damages or loss resulting from the breach." *Richelson v. Liberty Ins. Corp.*, 796 F. App'x 277, 281 (6th Cir. 2020) (quoting *Lucarell v. Nationwide Mut. Ins. Co.*, 97 N.E.3d 458, 469 (Ohio 2018)). Ohio law also implies a duty to exercise good faith and fair dealing, which has been described as "[a] compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." *Accurate Elec. Constr., Inc. v. Ohio State Univ.*, 149 N.E.3d 1080, 1106 (Ohio Ct. App. 2019) (quoting *Nat'l/RS, Inc. v. Huff*, No. 10AP-306, 2010 WL 5550694, at *4 (Ohio Ct. App. Dec. 30, 2010)). *See also Wendy's Int'l, Inc. v. Saverin*, 337 F. App'x 471, 476 (6th Cir. 2009) (quoting *Littlejohn v. Parrish*, 839 N.E.2d 49, 54 (Ohio Ct. App. 2005)) (Ohio law's implied duty of good faith and fair dealing contemplates "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party."). Ohio law does not, however, "recognize a stand-alone claim for breach of the implied covenant of good

18

faith and fair dealing[;]" rather, it is part of the underlying contract claim. *Frisch v. Nationwide Mut. Ins. Co.*, 553 F. App'x 477, 482 (6th Cir. 2014) (citations omitted).

Plaintiff's breach of contract claim references two actions by CCHMC related to the employment agreement:

> 125. On September 18, 2020, [d]efendants breached [plaintiff's] Employment Agreement by *preventing him from exercising his duties* pursuant to Section 5 of the Employment Agreement.

> 126. On September 18, 2020, [d]efendants also breached [plaintiff's] Employment Agreement by refusing to honor their *obligation to mutually attempt to resolve the dispute before imposing the suspension as set forth in Section 18(j) of the Agreement.*

(Doc. 1, PAGEID 25 at ¶¶ 125-26) (emphasis added).[8]  While plaintiff argued in connection with his Ohio public policy claims that his discipline was *not* covered by his employment agreement (*see* Doc. 13 at PAGEID 268-69) ("[Plaintiff's] suspension of privileges arises out of the CCHMC medical staff bylaws, not his contract."), plaintiff's employment agreement with CCHMC incorporates such bylaws as noted above.  (*See supra* p. 15).  Plaintiff's complaint alleges that he "invoked his contractual right to dispute resolution regarding the suspension" and CCHMC "breached his employment contract by failing to postpone the suspension."   (Doc. 1, PAGEID 19 at ¶ 86).  Plaintiff further alleges that because CCHMC's breach was in retaliation for his having hired counsel and reported potential law violations involving public health and safety, CCHMC also breached its duty of good faith and fair dealing.  For these reasons, the Court finds that plaintiff has plausibly alleged a breach of contract claim under § 18(j) of the employment agreement.

---

[8] Although plaintiff refers to "Defendants" (plural) with respect to his breach of contract claim, only CCHMC appears to be a party to the contract and plaintiff asserts no basis for breach of contract liability as to the individual defendants.

Plaintiff also argues that his suspension by defendants prevented his performance under § 5 of the employment agreement.  While plaintiff does not cite a prevention-of-performance doctrine expressly or provide supporting case law, he appears to allude to Ohio law recognizing a breach of contract "[w]here one party to a contract hinders or prevents the completion of a contract. . . ."  *Rockwell Int'l Corp. v. Reg'l Emergency Med. Servs. of Nw. Ohio, Inc.*, 688 F.2d 29, 31 (6th Cir. 1982) (citations omitted); *see also Rohde v. Mass. Mut. Life Ins. Co.*, 632 F.2d 667, 670 (6th Cir. 1980) ("The nonoccurrence or nonperformance of a condition is excused where that failure of the condition is caused by the party against whom the condition operates to impose a duty.") (citing *Fire Assoc. of Phila. v. Appel*, 80 N.E. 952 (Ohio 1907) and *Hulett v. Fairbanks*, 40 Ohio St. 233 (Ohio 1883)).  This doctrine, however, does not appear to be on all fours with the allegations in the complaint.  In *Rockwell*, for example, the Court held that if the defendant had prevented the plaintiff from installing equipment pursuant to a contract, the defendant could not repudiate the contract by arguing that the plaintiff did not timely complete the promised task.  *Id.* at 31.

Neither plaintiff's complaint nor his response explain the applicability of this doctrine to the allegations at bar.  Plaintiff does not allege that CCHMC prevented him from performing under the employment agreement and subsequently relied on that nonperformance to claim a breach.  Plaintiff has not adequately alleged a breach of contract claim under § 5 of the employment agreement.  Therefore, defendants' motion to dismiss Count V should be granted as to § 5 of the employment agreement but denied as to § 18(j) of the employment agreement.

### E. Tortious interference with business relationship

Defendants first argue that this claim must fail as it pertains to Drs. Ruddy and von Allmen.  *See Peters v. Monroe Twp. Bd. of Trs.*, No. 2:11-cv-00083, 2011 WL 3652719, at *5

20

(S.D. Ohio Aug. 18, 2011) (quoting *Smiddy v. Kinko's, Inc.*, No. C-020222, 2003 WL 203576, at *3 (Ohio Ct. App. Jan. 31, 2003)) ("Ohio Courts have held, '[a] person in a supervisory capacity or other position of authority over the employee cannot be sued for interfering with the employment relationship that it is his duty to monitor, supervise, or enforce.'").  Here, however, plaintiff alleges tortious interference with *business relationship* as opposed to employment relationship—a distinct tort.  *See id.* at *5-6.  As such, the Court does not find that *Peters* provides a basis upon which to dismiss plaintiff's tortious interference with business relationship claim as to Drs. Ruddy and von Allmen.

Otherwise, defendants argue that this claim should be dismissed because plaintiff fails to allege the loss of patients, actual malice to overcome defendants' qualified privilege to interfere, or damages.  Plaintiff responds that the complaint alleges lost surgeries and referrals during his suspension, actual malice (understood in this context as unjustified or improper interference), and lost revenue.

"Tortious interference with a business relationship requires that a defendant interfere with the relationship of the plaintiff and a third party."  *Kuvedina, LLC v. Cognizant Tech. Sols.*, 946 F. Supp. 2d 749, 757 (S.D. Ohio 2013) (citation omitted).  To state a claim for tortious interference with a business relationship under Ohio law, a plaintiff must allege: "(1) the existence of a business relationship; (2) the tortfeasor's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom."  *Id.* at 756 (citation omitted).  Tortious interferences cases are subject to a defense of "qualified privilege to affect one another's affairs" where two entities are in a business relationship.  *Zarwasch-Weiss v. SKF Economos USA, Inc.*, Nos. 1:10-cv-01327, 1:10-cv-01548, 2012 WL 194515, at *13 (N.D. Ohio Jan. 12, 2012) (citing *Chandler & Assoc., Inc. v. Am.'s*

*Healthcare All., Inc.*, 709 N.E.2d 190, 197 (Ohio Ct. App. 1997)). Qualified privilege may be

overcome by a showing of actual malice, which in this context is not "ill-will or spite but []

unjustified or improper interference." *Id.*

Defendants cite *WLB Radiology, LLC v. Mercy Health N., LLC*, 69 N.E.3d 1032, 1044

(Ohio Ct. App. 2016), for the proposition that plaintiff is required to allege the loss of actual

patients to state a claim for tortious interference with a business relationship. But *WLB*

*Radiology* and the case it relies upon (*Sickle-Santanello v. Ohiohealth Corp.*, No. 10 CV 17393,

2013 Ohio Misc. LEXIS 9348, *19 (Ohio C.P. May 31, 2013)) both stand for the proposition that

general allegations of interference, as opposed to specific patients lost, do not defeat *summary*

*judgment*. *Id.* The Court therefore does not find that these cases support dismissal of this claim

at this stage of the litigation.

As it relates to actual malice, plaintiff alleges that defendants retaliated against and made

false and defamatory statements about him, which led to his suspension. (Doc. 1, PAGEID 26 at

¶ 132). Plaintiff also alleges that defendants "through their agents and employees, reached out to

the referring physicians in an effort to induce or cause a breach or termination of the relationship

or expectancy with the referring physicians, these patients and [plaintiff]." (*Id.* at ¶ 133).

Defendants argue that these allegations are not substantiated by any specifics and that their

suspension of plaintiff was an action cloaked in immunity as part of the peer review process.

The Court has already determined, however, that defendants' potential immunity cannot be

determined at this stage of the litigation. Further, because the Court has concluded that

plaintiff's allegations of defendants' actual malice related to his discipline are sufficient to

survive a motion to dismiss based on peer-review immunity under Ohio law, they are also

22

sufficient at this stage of the proceedings to state a claim for tortious interference with business relationship. *See supra* pp. 9-10.[9]

Finally, while defendants argue that plaintiff's complaint is devoid of any allegation that he lost patients or referrals, plaintiff does allege that "[a]s a result of the 14-day suspension, [he] has been unable to perform surgeries and cannot accept referrals to him from other physicians of patients who require the specialty services [he] is qualified to perform." (*See* Doc. 1, PAGEID 20 at ¶ 89). Plaintiff also alleges that the tortious interference resulting in his suspension caused "substantial economic injury, loss of goodwill, harm to its business reputation, loss of esteem and standing in the community, and loss of business opportunities." (*Id.*, PAGEID 27 at ¶ 135). Finally, plaintiff alleges, generally, that he will be required to disclose his suspension in "future applications for hospital privilege and/or membership" and that the suspension has damaged him "professionally, financially and emotionally." (*Id.*, PAGEID 20 at ¶¶ 88, 90). The Court finds that plaintiff has adequately alleged damages. Defendants' motion to dismiss Count VI of plaintiff's complaint should be denied.

### F. Intentional infliction of emotional distress

Defendants argue that plaintiff's allegations are conclusory and insufficient to state an intentional infliction of emotional distress claim under Ohio law. Plaintiff responds that the retaliatory actions he alleges in the complaint were so outrageous that he has suffered "emotional distress[,] humiliation, mortification, embarrassment, sleeplessness and anxiety." (Doc. 1, PAGEID 27 at ¶ 141).

---

[9] Although the meaning of "actual malice" in the context of Ohio's peer review statute (knowingly or recklessly making false statements, *see Wall, Inc.*, 695 N.E.2d at 1241) is slightly different from its meaning in this context (unjustified or improper interference, *see Zarwasch-Weiss*, 2012 WL 194515, at *13), the Court finds that plaintiff's allegations meet either standard for purposes of defendants' motion to dismiss.

To make out an intentional infliction of emotional distress claim, plaintiff must allege that "(1) defendant intended to cause emotional distress, or knew or should have known that actions taken would result in serious emotional distress; (2) defendant's conduct was extreme and outrageous; (3) defendant's actions proximately caused plaintiff's psychic injury; and (4) the mental anguish plaintiff suffered was serious." *Hanly v. Riverside Methodist Hosp.*, 603 N.E.2d 1126, 1132 (Ohio Ct. App. 1991) (citing *Pyle v. Pyle*, 463 N.E.2d 98, 103 (Ohio Ct. App. 1983)). These claims may be disposed of on a motion to dismiss. *See Miller v. Currie*, 50 F.3d 373, 377-78 (6th Cir. 1995) ("It is well accepted that intentional infliction of emotional distress claims may entirely appropriately be dealt with on summary judgment or in a motion to dismiss.").

The Court's focus—as emphasized by all parties—is whether the alleged conduct is so "extreme and outrageous" that "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Miller*, 50 F.3d at 378 (quoting *Yeager v. Loc. Union 20, Teamsters, Chauffeurs, Warehousemen, & Helpers of Am.*, 453 N.E.2d 666, 671 (Ohio 1983), *abrogated on other grounds by Welling v. Weinfeld*, 866 N.E.2d 1051 (Ohio 2007)). "[L]iability for intentional infliction of emotional distress 'has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Day v. Nat'l Elec. Contractors Ass'n*, 82 F. Supp. 3d 704, 709 (S.D. Ohio 2014) (quoting *Yeager*, 453 N.E.2d at 671). The alleged conduct must go beyond malicious, tortious, or even criminal. *Yeager*, 453 N.E.2d at 671 (citing Restatement (Second) of Torts § 46, cmt. d (1965)). The resulting distress must be so "severe and debilitating" that "a reasonable person, normally constituted, would be

unable to cope adequately with the mental distress engendered by the circumstances of the case." *Paugh v. Hanks*, 451 N.E.2d 759, 765 (Ohio 1983) (citations omitted).

Plaintiff has not alleged facts indicating that defendants engaged in conduct that a reasonable person could conclude is "beyond all bounds of decency" or atrocious. *Day*, 82 F. Supp.3d at 709 (quoting *Yeager*, 453 N.E.2d at 671). The allegedly unwarranted and retaliatory disciplinary actions directed at plaintiff are similar to those found insufficient to satisfy the second element of an intentional infliction of emotional distress claim. *See Nuovo v. The Ohio State Univ.*, 726 F. Supp. 2d 829 (S.D. Ohio 2010) (suspension of physician's laboratory and clinical privileges, filing academic and scientific misconduct charges against him, and making disparaging remarks about his ethnicity to allegedly coerce physician to approve changes to quality assurance program at university's pathology laboratory did not constitute conduct that reasonable person could conclude was beyond all possible bounds of decency); *Kerr v. Hurd*, 694 F. Supp. 2d 817 (S.D. Ohio 2010) (subjecting physician to harassment, unwarranted disciplinary action, and false allegations of professional misconduct in retaliation for physician's insistence on teaching certain gynecological surgery techniques did not rise to level of severity required for intentional infliction of emotional distress under Ohio law). The Court finds that the conduct alleged in the complaint is not sufficiently "extreme and outrageous" to satisfy the second element of the prima facie intentional infliction of emotional distress case. *Yeager*, 453 N.E.2d at 671. Count VII of plaintiff's complaint should be dismissed.

### G. Negligent infliction of emotional distress

Defendants first argue that plaintiff has not alleged an underlying negligence claim to buttress his negligent infliction of emotional distress claim. Next, they argue that Ohio law does not recognize negligent infliction of emotional distress claims in the employment context.

25

Finally, they reemphasize that plaintiff's allegations do not meet the standard of severity needed for emotional distress torts as enunciated in *Paugh*.  In response, plaintiff admits that Ohio courts have prohibited negligent infliction of emotional distress claims based on an employee's termination.  Plaintiff argues that the basis for his negligent infliction of emotional distress claim, however, is not termination but defendants' retaliation against him.

"To state a claim for negligent infliction of emotional distress under Ohio law, the plaintiff must allege that he was aware of real physical danger to himself or another." *Doe v. SexSearch.com*, 551 F.3d 412, 417 (6th Cir. 2008) (citing *Heiner v. Moretuzzo*, 652 N.E.2d 664, 669 (Ohio 1995) and *King v. Bogner*, 624 N.E.2d 364, 367 (Ohio Ct. App. 1993)).  "Ohio courts have limited recovery for negligent infliction of emotional distress to such instances as where one was a bystander to an accident or was in fear of physical consequences to his own person." *Heiner*, 652 N.E.2d at 669 (citations omitted).

In *Hunter v. Hamilton Cnty.*, No. 1:15-cv-540, 2016 WL 2744832 (S.D. Ohio May 10, 2016), *report and recommendation adopted*, 2016 WL 4836810 (S.D. Ohio Sept. 15, 2016), the undersigned considered a negligent infliction of emotional distress claim alleging severe emotional distress related to the "stigma of being falsely accused and wrongfully convicted of a crime while holding a judicial office" and "baseless criminal prosecutions, charges, misrepresentations and other actions, and denial of due process and equal protection under the law." *Id.* at *6 (quoting the plaintiff's complaint).  The undersigned concluded that these allegations, similar in character to those at bar, did not "involve[] an awareness of 'real physical danger to [herself] or another'" and recommended dismissal of the claim. *Id.* (quoting *Doe*, 551 F.3d at 417).  For this same reason, the Court recommends that Count VIII of plaintiff's complaint be dismissed.

**IT IS THEREFORE ORDERED** that the parties' requests for oral argument are

**DENIED**.

**IT IS THEREFORE RECOMMENDED THAT** defendants' motion to dismiss (Doc.

8) be **GRANTED** as to Counts I-IV and VII-VIII, **GRANTED IN PART AND DENIED IN in**

**PART** as to Count V as explained herein, and **DENIED** as to Count VI.


Date:    4/26/2021

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

CHARLES T MEHLMAN,                                    Case No. 1:20-cv-813
      Plaintiff**,**                                   Dlott, J.
                                                     Litkovitz, M.J.

     vs.

CINCINNATI CHILDREN'S HOSPITAL
MEDICAL CENTER, et al.,
      Defendants.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), WITHIN 14 DAYS after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.   This period may be extended further by the Court on timely motion for an extension.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections WITHIN 14 DAYS after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).