IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Charles T. Mehlman, : | |
| : | Case No. 1:20-cv-813 |
| Plaintiff, : | |
| : | Judge Susan J. Dlott |
| v. : | |
| : | Order Adopting Report and |
| Cincinnati Children's Hospital Medical : | Recommendation and Granting in Part |
| Center, : | the Motion to Dismiss |
| : | |
| Defendant. : | |

This matter is before the Court on the Motion to Dismiss (Doc. 8) filed by Defendants Cincinnati Children's Hospital Medical Center ("CCHMC"), Dr. Richard M. Ruddy, and Dr. Daniel von Allmen; the Order and Report and Recommendation ("R&R") (Doc. 15) issued by Magistrate Karen L. Litkovitz; and the Objections (Doc. 18) to the R&R filed by Plaintiff Charles T. Mehlman.  Dr. Mehlman filed an eight-count Complaint against CCHMC, his former employer, and two individual members of the Medical Executive Committee at CCHMC, alleging they took a series of retaliatory actions against him.  Defendants moved to dismiss the Complaint.  Following briefing, the Magistrate Judge recommended in the R&R that Counts I–IV, VII, and VIII be dismissed in full and that Count V be dismissed in part.  Dr. Mehlman has objected only to the dismissal of Count I, retaliation in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3730(h), against CCHMC.  For the reasons that follow, the Court **ADOPTS** the R&R as to all counts.

I.      BACKGROUND

A.      Facts Alleged

These background facts are derived from the well-pleaded allegations of the Complaint

1

and are focused on the FCA retaliation allegations. Dr. Mehlman is a pediatric surgeon licensed to practice medicine in the State of Ohio. (Doc. 1 at PageID 4.) He began his employment at CCHMC in 1996 as an attending pediatric surgeon. (*Id.*) Dr. Mehlman's employment at CCHMC overlapped with the time that Abubakar Atiq Durrani was employed and performed surgeries at CCHMC. (*Id.* at PageID 2, 5.)[1] Durrani was known as the top producer—that is the highest biller—in the surgery department at CCHMC. (*Id.*) His billing doubled from $1.5 million in 2005 to $3.6 million in 2008. (*Id.* at PageID 2, 5–6.) Durrani was sued for malpractice in numerous suits starting during his residency and continuing after he stopped performing surgeries at CCHMC in March 2009. (*Id.* at PageID 5.) Dr. Mehlman alleged generally that Defendants subjected him to an "insidious pattern of retaliatory actions" because he voiced concerns about "the dangerous and fraudulent practices of the now infamous" Durrani. (*Id.* at PageID 2.)

Dr. Mehlman "grew increasingly concerned about the medical treatment and care provided by Durrani at CCHMC" beginning in 2006. (*Id.* at PageID 9.) Patients suffered serious spinal cord complications following surgeries performed by Durrani. (*Id.* at PageID 9–10.) Dr. Mehlman raised the concern to multiple CCHMC administrators that "[t]hese complications had never been seen before at CCHMC." (*Id.* at PageID 10.) More specifically, Dr. Mehlman alleged the following about the concerns and complaints he raised:

> 40. Dr. Mehlman repeatedly made his concerns about Durrani known to the Division Director for Orthopedics, as well as others in leadership positions at CCHMC.
>
> 41. For over a year, Dr. Mehlman raised concerns orally and in writing about Durrani's practices with departmental leadership. Yet, Defendants ignored his concerns and continued to allow Durrani to treat patients, perform surgeries, use

---

[1] Durrani's medical licenses were suspended by the State Medical Boards of Ohio and Kentucky. *See* Ohio eLicense Ohio Professional Licensure, License Look-up, https://elicense.ohio.gov/oh_verifylicense (last viewed Aug. 4, 2021). The Court will refer to him as Durrani, and not as Dr. Durrani, for that reason.

experimental surgical procedures on children, and even frequently book two operating rooms simultaneously.

42. Dr. Mehlman brought concerns about physician competency and unnecessary and/or dangerous and/or unapproved experimental procedures to CCHMC peer review meetings in order to ensure that the procedures, some of which resulted in additional surgeries and even spinal cord injury/paralysis be investigated. Defendants did not entertain Dr. Mehlman's demands, nor did they welcome his questions.

43. To the contrary, Dr. Mehlman's demands for accountability led to complaints about him from senior management at CCHMC who were backing Durrani due to his generation of revenue and led eventually to Dr. Mehlman's being suspended.

44. Although Dr. Mehlman brought the issue of unnecessary, risky and/or unapproved procedures to the attention of CCHMC executives and Defendants in particular, they continued to submit claims to the Federal Government for reimbursement in violation of the fraud and abuse laws.

45. Dr. Mehlman repeatedly brought his concerns over the significant number of patient, physician and nurses complaints regarding deficient quality of care and overall negative customer service to the attention of CCHMC executives, and Defendants in particular, but his concerns were ignored. Instead, as a result of Dr. Mehlman's continued efforts to alert CCHMC executives, and Defendants in particular, that these complaints were serious and had to be addressed, Defendants responded by systematically, retaliating against and, eventually suspending Dr. Mehlman.

46. Yet, again, no action was taken against Durrani.

47. Dr. Mehlman repeatedly voiced concerns about the routine low levels of competent support offered to surgeons at CCHMC as they performed various complicated surgical procedures. There is no more dramatic and tragic example of this than the August 21, 2010 high profile intraoperative death of 7-month-old Tressel Meinardi who died because of incompetent support by operating room personnel.

48. Dr. Mehlman (along with co-authors that included James J McCarthy, MD and Richard Falcone, MD, MPH) conducted internal research aimed at measuring the variation of CCHMC pediatric orthopedic surgical team composition (seeking to quantify how often high frequency team members supported surgical procedures). There were two studies, V.I.P.E.R. (variation in pediatric emergency resources) looking at 634 pediatric trauma surgeries and V.I.S.O.R. (variation in scoliosis operative resources) looking at 100 idiopathic scoliosis surgeries. Both of these studies found disturbingly low levels of high frequency team members supporting the surgeons' cases: only 66% of the trauma cases had high frequency

3

team members and a shocking 34% of scoliosis cases had high frequency team members.

49. The V.I.P.E.R. and V.I.S.O.R study results were shared with CCHMC senior leadership, including but not limited to August 7, 2013 communication with Frederick C Ryckman, MD (surgeon director of the CCHMC operating rooms) and August 26, 206 communication with Richard Ruddy, MD (at that time Chairman of PPEC).

50. Other specific instances of Dr. Mehlman alerting CCHMC leadership (and the reactions of the leadership) are as follows:

(i) On or about June 19, 2006 after orally complaining about Durrani's medical practices during a teaching conference, Dr. Eric Wall, who was Pediatric Orthopedic Surgery Division Director, passes a message from the leadership to Dr. Mehlman: "Chuck, you've been asked to be quiet.".

(ii) At around the same time, Dr. Junichi Tamai, (also Pediatric Orthopedic Surgeon attending the same teaching conference and sitting near Dr Mehlman), states to Dr. Mehlman: "Sometimes asking questions makes you a bad person."

(iii) On or around November 20, 2007, after Durrani performed a questionable experimental surgery, Dr. Mehlman emails Dr. Eric Wall suggesting a review of the institutional review board ("IRB"), also known as institutional review board ("IRB").

(iv) In a series of subsequent emails to leadership between December 2007 and February 2008, Dr. Mehlman again warns about the dangers of the experimental surgeries performed by Durrani and the discovery by Dr. Mehlman's of non-IRB approved research by Durrani.

(v) On March 6, 2008, Dr. Mehlman emails Dr. Wall to recommend that the issue of the non-IRB approved experimental surgery be taken to CCHMC's Chief of Surgery.

(vi) From April 3, to April 7, 2008, Dr. Mehlman sends a series of emails to IRB Chairman Robert Frenck, MD, culminating in the latter directing Durrani to retract his non-IRB approved research submission.

(vii) Despite Dr. Mehlman continuing to alert leadership that Durrani's dangerous practices were still going on, on June 27, 2008, Dr. Mehlman was asked by CCHMC personnel to support Durrani's application for permanent residency. Dr. Mehlman refused. Less than six weeks later, on August 7, 2008, Durrani tendered his resignation letter to CCHMC. However, CCHMC allowed Durrani to perform more than 200 additional questionable surgeries after that.

>> (viii) Some of these surgeries CCHMC allowed Durrani to perform included patients Kenny Wilson and Joshua Roy.

(*Id.* at PageID 10–13 (emphasis added).)

Dr. Mehlman was deposed in lawsuits against Durrani arising from the Wilson and Roy surgeries in October 2011 and November 2012, respectively. (*Id.* at PageID 14.) In October 2012, the CCHMC Professional Practice Evaluation Committee ("PPEC") raised concerns about Dr. Mehlman's behavior and interactions in the operating room. (*Id.*) It was the first time PPEC ever had raised concerns about him during his fourteen years of employment. (*Id.*)

Federal agents interviewed Dr. Mehlman about Durrani and his actions at CCHMC in May 2013. (*Id.*) In July 2013, local media reported that Durrani would be "criminally charged with one count of health care fraud and one count of making a false statement on health care matters." (*Id.*) A federal grand jury indicted Durrani in August 2013. (*Id.*) Later that month, two CCHMC executives, and then separately two PPEC staff members, met with Dr. Mehlman and accused him of engaging in "abusive comments, demeaning comments, and insulting comments" with orthopedic and urology operating staff. (*Id.* at PageID 14–15.)

Durrani fled the United States to avoid criminal prosecution in December 2013. (*Id.* at PageID 15.) Numerous medical malpractice suits were filed against Durrani between late 2013 and 2015, and more than eighty suits named CCHMC as a defendant. (*Id.*) Requests to depose Dr. Mehlman were sent to CCHMC through its counsel, but Dr. Mehlman was not notified of the requests. (*Id.*) PPEC increased the number of reprimands it issued to Dr. Mehlman after these lawsuits were filed. (*Id.* at PageID 15–16.) PPEC reprimanded Dr. Mehlman in January 2015 regarding negative results in a patient and family relations survey. (*Id.* at PageID 15.) PPEC submitted a letter to Dr. Mehlman's file in October 2016 about allegations that had been addressed several months earlier. (*Id.* at PageID 15–16.) PPEC again reprimanded Dr. Mehlman

additional times in late 2017 through early 2018 as another civil case against Durrani and CCHMC moved through discovery. (*Id.* at PageID 16.) In February 2018, a law firm filed a motion to compel Dr. Mehlman's deposition testimony for "all Children's cases on the issue of Children's liability." (*Id.*) Dr. Mehlman alleges that CCHMC increased its retaliatory actions against him when it became more likely that he would be deposed regarding Durrani. (*Id.*) PPEC placed Dr. Mehlman on a performance improvement plan in March 2018 for reasons he believed to be insufficient to warrant the action. (*Id.*)

In June 2018, Dr. Mehlman testified by deposition under subpoena on the issue of CCHMC's liability in the Durrani cases. (*Id.*) Two weeks later, CCHMC notified Dr. Mehlman that it was extending his clinical privileges for only six months, instead of the two-year period that had been the standard extension during his career. (*Id.* at PageID 17.)

In December 2018, Dr. Mehlman testified under subpoena at a Durrani malpractice trial. The jury returned a verdict in that case against CCHMC for negligently retaining Durrani's privileges to practice medicine at the hospital. (*Id.* at PageID 17–18.) PPEC continued to counsel Dr. Mehlman on previously existing and new issues after the verdict was issued against CCHMC. (*Id.* at PageId 18–19.) CCHMC suspended Dr. Mehlman for two weeks in September 2020. Dr. Mehlman alleged that each disciplinary step taken against him, and the delay in his renewal of his staff privileges, was done in retaliation for him "exercising his right and duty to testify and/or report safety violations." (*Id.* at PageID 19.)

**B.     Procedural Posture**

On October 1, 2020, Dr. Mehlman filed the instant Complaint against CCHMC, Dr. Ruddy, and Dr. von Allmen asserting the following purported claims for relief:

Count I:     Retaliation in violation of the False Claims Act;

6

| | | |
|---|---|---|
| Count II: | | Retaliation for providing truthful testimony in violation of Ohio public policy; |
| Count III: | | Retaliation for reporting suspected risks to patient health and safety in violation of Ohio public policy; |
| Count IV: | | Retaliation for retaining counsel in violation of Ohio public policy; |
| Count V: | | Breach of contract and the duty of fair dealing; |
| Count VI: | | Tortious interference with business relationship; |
| Count VII: | | Intentional infliction of emotional distress; and |
| Count VIII: | | Negligent infliction of emotional distress. |

(Doc. 1 at PageID 20–28.) This Court referred the case to Magistrate Judge Litkovitz for all motions except summary judgment. (Doc. 2.)

Defendants moved to dismiss the Complaint in lieu of filing an answer. (Doc. 8.) On April 16, 2021, Magistrate Judge Litkovitz issued the R&R recommending that the Court dismiss Counts I–IV and VII–VIII in full and Count V in part. (Doc. 15 at PageID 327.) She recommended dismissing Count V in full against Dr. Ruddy and Dr. von Allmen and dismissing the claim in part against CCHMC. (*Id.* at PageID 317–320.) She recommended denying dismissal as to Count V in part against CCHMC only and as to Count VI in full. (*Id.* at PageID 317–323.) Defendants did not object to the R&R. Dr. Mehlman filed the pending Objections to the R&R, but he objects only insofar as Magistrate Judge Litkovitz recommended dismissing Count I, the FCA retaliation claim. CCHMC filed a Response to the Objections, (Doc. 19), and the Objections now are ripe for adjudication.

**II.   STANDARDS OF REVIEW**

Federal Rule of Civil Procedure 12(b)(6) allows a party to move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To

withstand a dismissal motion, a complaint must contain "more than labels and conclusions [or] a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Courts do not require "heightened fact pleading of specifics, but only enough facts to state a claim for relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A district court examining the sufficiency of a complaint must accept the well-pleaded allegations of the complaint as true. *Id.*; *DiGeronimo Aggregates, LLC v. Zemla*, 763 F.3d 506, 509 (6th Cir. 2014).

Magistrate judges are authorized to decide dispositive and non-dispositive matters pursuant to 28 U.S.C. § 636 and Rule 72 of the Federal Rules of Civil Procedure. The district judge must conduct a *de novo* review of a magistrate judge's recommendation on a dispositive motion. *Baker v. Peterson*, 67 F. App'x 308, 310 (6th Cir. 2003). "The district court need not provide *de novo* review where the objections are frivolous, conclusive or general." *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986) (per curiam) (cleaned up).

### III. ANALYSIS

#### A. Count I—Retaliation in Violation of the False Claims Act

The primary issue before the Court is whether the Magistrate Judge was correct to recommend dismissal of the FCA retaliation claim against CCHMC. The FCA prohibits a person from knowingly presenting a false claim for payment to the federal government or knowingly making a false statement material to a false or fraudulent claim. *See* 31 U.S.C. § 3729(a)(1)(A) & (B). To protect employees, the FCA also prohibits employers from retaliating against employees who attempt to prevent violations of the Act:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1). A plaintiff must establish the following three elements to prove an FCA retaliation claim: (1) the employee was engaged in a protected activity; (2) the employer knew that the employee engaged in the protected activity; and (3) the employer discharged or otherwise discriminated against the employee as a result of the protected activity. *Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394, 398 (6th Cir. 2015).

For the first prong, the protected activity must relate to "exposing fraud" or "involvement with a false claims disclosure." *McKenzie v. BellSouth Tel., Inc.*, 219 F.3d 508, 516 (6th Cir. 2000) (citation omitted). If the protected activity is internal reporting, the reports "must allege fraud on the government." *Id.* It is not enough to merely report wrongdoing to an employer if the action is not in furtherance of a reasonable or distinct possibility of an FCA investigation or claim. *Id.* at 516–517. Additionally, an "effort to stop 1 or more violations" of the FCA also may constitute protected activity. 31 U.S.C. § 3730(h). Plaintiffs may engage in protected activity "before they have put all the pieces of the fraud together" and "even if the target of an investigation or action to be filed was innocent," but "these lenient standards for establishing protected activity remain subject to a reasonable belief requirement." *Jones-McNamara*, 630 F. App'x at 399 (citations omitted).

As to the second prong, the employer must be on notice that the plaintiff's complaints have some nexus to a concern about fraud on the federal government. *United States ex rel. Marlar v. BWXT Y-12, L.L.C.*, 525 F.3d 439, 450 (6th Cir. 2008). The notice to the employer defendant need not explicitly characterize the plaintiff's concerns as involving false claims

9

against the government, but "there must be some reason for the employer to suspect that the plaintiff was contemplating a *qui tam* action or was assisting the government in an FCA investigation." *Kachaylo v. Brookfield Tp. Bd. of Trs.,* 778 F.Supp.2d 814, 820–821 (N.D. Ohio 2011). Finally, as to the third prong, "an adverse employment action in the retaliation context requires a showing that a reasonable employee would have found the challenged action materially adverse, which means it well might have dissuaded a reasonable worker from engaging in protected activity." *Vander Boegh v. EnergySolutions, Inc.*, 536 F. App'x 522, 529 (6th Cir. 2013) (cleaned up).

Magistrate Judge Litkovitz held that Dr. Mehlman's allegations did not satisfy the first prong of a retaliation prima facie case. She found that he had not pleaded facts showing that he engaged in protected activity by raising concerns that were connected to exposing fraud or false claims against the federal government. (Doc. 15 at PageID 314.) Instead, she characterized the Complaint as alleging that Dr. Mehlman "repeatedly brought concerns about Durrani's practices and competency to CCHMC." (*Id.*) She concluded that the Complaint "fail[ed] to plausibly allege protected activity under the FCA." (*Id.*)

Dr. Mehlman objects that the Magistrate Judge's R&R failed to address cases holding that a doctor's false certification that a procedure was medically necessary can lead to FCA liability. *See*, *e.g.*, *Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Center, Inc.*, 953 F.3d 1108, 1118 (9th Cir. 2020) (stating that "a false certification of medical necessity can give rise to FCA liability"), *cert. denied sub nom. RollinsNelson LTC Corp. v. United States ex rel. Winter*, 141 S. Ct. 1380 (2021); *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004) (stating that "claims for medically unnecessary treatment are actionable under the FCA"). The objection misses the mark, however. Dr. Mehlman pleaded in

¶¶ 42 and 44 of the Complaint that he brought the issue of unnecessary procedures to the attention of CCHMC. (Doc. 1 at PageID 10.) However, he did not plead that he complained about unnecessary procedures to expose or prevent fraud upon the federal government.

Instead, his complaints about unnecessary procedure arose from his concern for patient safety and outcomes. For example, he pleaded in ¶ 42 that he "brought concerns about physician competency and unnecessary and/or dangerous and/or unapproved experimental procedures **to CCHMC peer review meetings to ensure that the procedures . . . be investigated.**" (*Id.* (emphasis added)). And in ¶ 44, Dr. Mehlman pleaded that "[a]lthough [he] brought the issue of unnecessary, risky, and/or unapproved procedures to the attention of CCHMC executives and Defendants in particular, they continued to submit claims to the Federal Government for reimbursement in violation of the fraud and abuse laws." (*Id.* at PageID 10–11.) Dr. Mehlman similarly complained about questionable, experimental, deficient, unsafe, and dangerous procedures in ¶¶ 41, 45, 50(iii)–(v), 50(vii), 84, 94, and 115. (*Id.* at PageID 10–13, 19–21, 24.) Separately, in ¶¶ 47 and 48, he alleged that he complained that there were an insufficient number of high frequency team members supporting surgeons' cases. (*Id.* at PageID 11.) The common theme of the allegations is that **Dr. Mehlman's focus was on the danger to patients** caused by the unnecessary procedures, even if **CCHMC's focus was on billing and reimbursement**. Dr. Mehlman did not allege that he complained to CCHMC that it should not be submitting claims to the federal government arising from Durrani's unnecessary procedures. As such, these allegations are insufficient to have stated a False Claims Act retaliation claim.

Dr. Mehlman also argues that the Magistrate Judge did not sufficiently credit his allegations that CCHMC stepped up its retaliatory actions against him after he cooperated in civil lawsuits and a federal investigation as set forth in ¶¶ 51–90. (*Id.* at PageID 13–20.)

11

Dr. Mehlman alleged in ¶¶ 53–54 that he was first deposed in civil malpractice lawsuits in 2011 and 2012. (*Id.* at PageID 14.) He gave this testimony, and later testimony, several years after Durrani had stopped performing surgeries at CCHMC in March 2009 and after any fraudulent billing based on those surgeries had ended. (*Id.* at PageID 5.) There is no basis to conclude that his testimony in the malpractice lawsuits involved concerns connected to exposing fraud against the federal government. Instead, those cases were about CCHMC's alleged negligence for allowing Durrani to perform surgeries up through March 2009 despite knowing about his pattern of inappropriate medical procedures. (*Id.* at PageID 13, 16–18.) For example, Dr. Mehlman alleged in ¶¶ 71 and 76 of the Complaint that he was subpoenaed to testify on the "issue of Children's liability." (*Id.* at PageID 16.) And he alleged in ¶ 81(i) that CCHMC subsequently was held liable in one case for permitting Durrani to retain his privileges despite knowing about his "pattern of inappropriate behavior and incompetence." (*Id.* at PageID 17.) These allegations lack a nexus to exposing fraud or violations of the FCA.

As to his interview with the federal agents, Dr. Mehlman alleged in ¶ 57 that the interview was about "Durrani and his actions at CCHMC." (*Id.* at PageID 14.) Similarly, Dr. Mehlman's attorney described the interview as regarding "his observations of Dr. Durrani." (Doc. 1-4 at PageID 145.) Dr. Mehlman did not allege that he told federal investigators about Durrani's or CCHMC's billing practices or claims submitted to the federal government. Instead, in an attempt to satisfy the FCA nexus requirement, Dr. Mehlman relies on the temporal proximity between his interview in May 2013 and the issuance of the initial criminal indictment against Durrani for health care fraud in August 2013. *See United States v. Durrani*, No. 1:13-cr-84, Indictment, Doc. 10 (S.D. Ohio Aug. 7, 2013). Any inference that arises from this temporal proximity, however, is undercut by the fact that most of criminal charges against Durrani are

based on surgeries he performed during and after 2009, after Durrani stopped performing surgeries at CCHMC. *Id.*, Superseding Indictment, Doc. 37 at PageID 168–176 (S.D. Ohio Oct. 16, 2013).

Regardless, this allegation about Dr. Mehlman's interview with federal agents has an additional flaw. Dr. Mehlman did not allege that CCHMC took an adverse action against him because he spoke to the federal agents. He alleged in ¶¶ 60–61 of the Complaint only that two sets of CCHMC administrators accused him in August 2013 of being abusive during staff interactions, two weeks after Durrani was indicted and three months after he spoke to the agents. (Doc. 1 at PageID 14–15.) Such informal verbal counseling is not an objectively material adverse action for purposes of an FCA retaliation claim. *Weigold v. ABC Appliance Co.*, 105 F. App'x 702, 708 (6th Cir. 2004) (stating that a verbal reprimand amounting to a mere criticism is not an adverse action). Based on the Complaint allegations, Dr. Mehlman did not receive a reprimand until 2015, was not placed on a performance improvement plan until 2018, and was not suspended until 2020. (Doc. 1 at PageID 15, 19.) Dr. Mehlman did not adequately connect these alleged adverse actions to his interview with the federal agents in 2013. For these reasons, the Court agrees with Magistrate Judge Litkovitz that Dr. Mehlman did not sufficiently plead a claim of retaliation in violation of the FCA. The Court will adopt her recommendation to dismiss Count I of the Complaint.

**B.     Leave to File Amended Complaint**

Having concluded that Dr. Mehlman failed to plead a sufficient FCA retaliation claim, the Court next will address his informal, undeveloped request to file an amended complaint. Dr. Mehlman requested at the conclusion of his Objections that he be granted leave to amend his Complaint if his allegations were inadequate. Dr. Mehlman has been on notice about the

13

deficiencies of his Complaint at least since April 26, 2021 when the Magistrate Judge issued the R&R. Nonetheless, he did not proffer a proposed amended complaint, set forth the additional allegations he would plead in an amended complaint, nor move the Court to amend under Rule 15(a) of the Federal Rules of Civil Procedure. As such, Mehlman has failed to demonstrate why the Court should grant leave to amend. *See C&L Ward Bros., Co. v. Outsource Sols., Inc.*, 547 Fed. App'x 741, 745 (6th Cir. 2013) ("A properly filed motion for leave complete with an indication of the grounds upon which the amendment is sought and the general contents of the amendment is preferable."); *Begala v. PNC Bank, Ohio Nat. Ass'n,* 214 F.3d 776, 784 (6th Cir. 2000) (finding district court did not err or abuse its discretion in denying leave to amend when the plaintiffs only made a vague request in a brief). This Court has declined to grant leave to amend in similar circumstances in at least one other case, and it declines to do so here. *See Terlesky v. Fifth Dimension, Inc.*, No. 1:15-CV-374, 2015 WL 7254189, at *6 (S.D. Ohio Nov. 17, 2015).

**C.    Remaining Claims**

The parties did not object to Magistrate Judge Litkovitz's recommended disposition of the remaining claims. Magistrate Judge Litkovitz recommended dismissing Count I against Dr. Ruddy and Dr. von Allmen, Counts II–IV and VII–VIII in full, and Count V in part. (Doc. 15 at PageID 327.) She recommended dismissing Count V in full against Dr. Ruddy and Dr. von Allmen and dismissing the claim in part against CCHMC as to § 5 of the Employment Agreement. (*Id.* at PageID 318–320.) Finally, she recommended denying dismissal as to Count V in part as to § 18(j) of the Employment Agreement against CCHMC only and as to Count VI. (*Id.* at PageID 317–323.) The parties did not object to any of these recommendations. Having reviewed the R&R, the Court concludes that the Magistrate Judge has correctly stated and

applied the controlling law in material respect.  Accordingly, the Court adopts the R&R on these claims as well.

## V. CONCLUSION

For the foregoing reasons, the Order and Report and Recommendation (Doc. 15) is **ADOPTED** and the Objections (Doc. 18) are **OVERRULED**.  Defendants' Motion to Dismiss (Doc. 8) is **GRANTED IN PART AND DENIED IN PART**.  Dr. Mehlman can proceed only on Count V against CCHMC in part as to § 18(j) of the Employment Agreement and on Count VI against Defendants.

**IT IS SO ORDERED.**

BY THE COURT:

S/Susan J. Dlott
Susan J. Dlott
United States District Judge